James R. STILLWAGON, Plaintiff,

v.

The CITY OF DELAWARE,
et al., Defendants.

James R. Stillwagon, Plaintiff,

v.

Officer James Ailes, et al., Defendants.

Case No. 2:14–cv–807, Case
No. 2:14–cv–1606

United States District Court,
S.D. Ohio, Eastern Division.

Signed 08/15/2017

722

James Donald McNamara, Columbus, OH, for Plaintiff.

Michael S. Loughry, Douglas C. Boatright, Douglas Paul Holthus, Stacy Virginia Pollock, Mazanec, Raskin & Ryder Co., LPA, Robert Henry Stoffers, Williams & Schoenberger Co., LLC, Columbus, OH, for Defendants.

## OPINION AND ORDER

EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE

This matter is before the Court on the parties' cross-motions for summary judgment. Defendants The City of Delaware (the "City"), Detective Benjamin Segaard, Former Detective Patrick Gerke, Officer Adam Willauer, Detective Sergeant Jonathan Radabaugh, Officer James Ailes, and

Officer Jason Flynn (collectively, the "Municipal Defendants")[1] have moved for summary judgment on all of Plaintiff James R. Stillwagon's ("Stillwagon") claims against them. (Defs.' Mot. for Summ. J. at 1 [ECF No. 203].)[2] Stillwagon, in turn, seeks summary judgment against several of the Municipal Defendants on his § 1983 false arrest, malicious prosecution, and excessive force claims, his Ohio law malicious prosecution claim, and his municipal liability claim relating to excessive force. (Pl.'s Mots. for Summ. J. [ECF Nos. 205, 206, 207].)

Also before the Court are two additional motions: the Municipal Defendants' Motion to Strike [ECF No. 231] and the Municipal Defendants' Motion to Exclude Certain Expert Testimony [ECF No. 232].

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Municipal Defendants' Motion for Summary Judgment [ECF No. 203; '1606 ECF No. 189] and Motion to Strike [ECF No. 231; '1606 ECF No. 217], **DENIES** Stillwagon's motions for summary judgment [ECF Nos. 205, 206, 207; '1606 ECF Nos. 191, 192, 193], and **GRANTS** the Municipal Defendants' Motion to Exclude [ECF No. 232; '1606 ECF No. 218].

## I. BACKGROUND

### A. Factual Background

This case stems from a series of widely publicized events that occurred in Delaware, Ohio, and the surrounding highways on September 30, 2012. The Court provides the following description of that

1. Stillwagon has sued an additional Defendant—Richard O. Mattingly. Stillwagon and Mattingly, however, have not moved for summary judgment against each other.

2. This matter involves two cases: case number 2:14–cv–807 and case number 2:14–cv–1606. Since the consolidation of these cases on October 19, 2016, filings in the matter have been uploaded to both case dockets and assigned a distinct ECF number in each docket. For simplicity, the Court refers to filings by only their docket number in the '807 case, unless otherwise noted.

day's events based primarily on Stillwagon's deposition testimony. Several witnesses observed portions of these events. And Defendant Mattingly has provided his own account of some of the events. The Court reviews the witness statements and Mattingly's account later.

### 1. Events on Route 42

On September 30, Stillwagon was riding his motorcycle northeast on Route 42 toward Delaware, Ohio. (*See* Stillwagon Dep. Vol. I at 60–62 [ECF No. 200–1].) Stillwagon had a handgun in the tank bag of the motorcycle. (*Id.* at 95.) He carried the weapon legally, as he had obtained a concealed carry permit several years earlier. (*See id.* at 35.)

Defendant Richard O. Mattingly was also driving on Route 42 on September 30. (*See* Mattingly Interview Tr. 1 at 5 [ECF No. 155–5].) Mattingly had consumed some beer at home. (Mattingly Interview Tr. 2 at 48 [ECF No. 184–4].) He then continued drinking as he drove his pickup truck. (*See id.* at 49.)

Stillwagon and Mattingly first came into contact at a Marathon station located at the intersection of Routes 42 and 33. (*See* Marathon Video at 15:07:52.) Stillwagon had stopped to buy gas; Mattingly had stopped for beer and cigarettes. (*See id.* at 15:07:38 to 15:13:17.) Both Stillwagon and Mattingly were parked at gas pumps. (*Id.* at 15:07:53 to 15:13:09.) Mattingly was parked behind Stillwagon. (*Id.*) Stillwagon pulled out of the station, and Mattingly left immediately behind him. (*Id.* at 15:13:02 to 15:13:20.)

Just northeast of the Marathon station, Route 42 narrows from four lanes to two lanes. (*See* Stillwagon Dep. Vol. I at 68–69.) As Stillwagon approached this merger, Stillwagon has testified that Mattingly sped past him on the left, cutting Stillwagon off and nearly hitting him. (*See id.* at 68–70.) The truck came within several inches of Stillwagon's motorcycle. (*See id.* at 69.) As he made the pass, Mattingly was looking at Stillwagon and laughing. (*See id.* at 68–69.) Mattingly then sped off out of Stillwagon's sight, "skip[ing] his tires" along the way (i.e., tapping his brakes to "lay rubber down"). (*Id.* at 70, 72.)

Less than two miles up the road, Stillwagon testified that Mattingly stopped his truck half on the road and half on the berm. (*See* Stillwagon Dep. Vol. I at 70–72.) Mattingly was waving a blue metal baseball bat out of the driver's side window, and signaling for Stillwagon to go around him. (*See id.*) Stillwagon did not drive around the truck; instead, he stopped and waited around 50 yards behind the truck. (*See id.* at 73.) Eventually Mattingly started moving again. (*Id.*) He sped off out of Stillwagon's sight. "skipp[ing] his tires a few times." (*Id.* at 73.)

Farther up the road, Stillwagon testified that Mattingly again stopped half on the road and halt on the berm. (Stillwagon Dep. Vol. I at 74.) He waved for Stillwagon to pass him using the baseball bat. (*Id.*) When Stillwagon did not pass him, Mattingly took off. peeling out and skipping his tires in the process. (*See id.* at 74–75.) Mattingly soon fell in behind a slower moving car though. (*See id.* at 75.) Stillwagon testified that he then passed Mattingly and the slower moving car. (*Id.*)

By riding north in the southbound lane, and forcing at least one car off the road in the process, according to Stillwagon, Mattingly caught up with him. (*See* Stillwagon Dep. Vol. I at 75–76; Oct. 1, 2012 Reninger Email at PageID 5110 [ECF No. 162–6].) Mattingly purportedly made three cut-in moves from Stillwagon's left, almost knocking Stillwagon off his bike. (Stillwagon Dep. Vol. I at 76–77.) On the third cut-in, Stillwagon braked. (*Id.* at 76.) Mattingly responded by making a sharp right turn

immediately in front of Stillwagon and braking hard. (*See id.* at 76–78.) Stillwagon testified that he was able to stop just soon enough to avoid colliding with the back of Mattingly's truck. (*See id.*)

Mattingly and Stillwagon were approaching the traffic light at Watkins/Moore Road by this point. (*See* Stillwagon Dep. Vol. I at 78.) The light was red. (*Id.*) Stillwagon testified that Mattingly drove through the red light and continued at a high rate of speed toward Delaware. (*See id.*) Stillwagon stopped at the light and then, after the light turned green, pulled into a gravel parking area. (*See id.* at 78–79.) Stillwagon wanted to distance himself from Mattingly. (*Id.* at 79.) While Stillwagon waited in the parking area, two motorists who had witnessed Mattingly's maneuvers (a woman named Lois Reninger and a man) stopped to ask if Stillwagon was alright. (*See id.* at 79–80.) The male motorist called the police at Stillwagon's request. (*See id.* at 80.) The police indicated that Stillwagon could wait by the side of the road for an officer to come and take a report. (*See id.*) Because the police had not given any indication of when an officer might come, Stillwagon decided that he would not make a report. (*See id.*) Stillwagon waited on the side of the road for several minutes. (*See* Stillwagon Interview Tr. 2 at 37, 41, 43 [ECF No. 160–11].) Stillwagon thought that Mattingly would be far up the road by that point. (*See* Stillwagon Dep. Vol. I at 83.) As a precaution, though, in case Mattingly tried "to come back down the road [to] try to run [him] over," Stillwagon removed his firearm from the tank bag and secured it in his jacket before leaving the parking area. (*See id.* at 96.)

Stillwagon drove several miles northeast on Route 42; as he passed Section Line Road, Mattingly pulled back onto the road behind him. (*See* Stillwagon Interview Tr. 1 at 17 [ECF No. 160–10]; Stillwagon interview Tr. 2 at 43–44; Oct. 2, 2012 Reninger Email at PageID 5111 [ECF No. 162–6].) There were five or six cars between them. (*See* Stillwagon Dep. Vol. I at 89–90.) Mattingly entered the southbound lane and passed them all. (*See id.*) Several cars in that lane had to pull off the road to avoid a head-on collision with Mattingly's truck. (*See id.* at 90.) Mattingly then pulled back into the right lane and accelerated. (*See id.*) Stillwagon testified that the truck came within inches of his motorcycle. (*See id.*) To avoid being rammed by the truck, Stillwagon sped up to almost 85 miles per hour. (*See id.* at 90–91.)

Mattingly slowed down and backed away from the bike. (*See* Stillwagon Dep. Vol. I at 91.) However, according to Stillwagon's account, Mattingly soon accelerated into the southbound lane and started his cut-in moves again. (*See id.* at 91–92.) Stillwagon braked. (*See id.* at 92.) Mattingly then cut in front of Stillwagon and braked hard, causing Stillwagon to nearly crash into the back of Mattingly's truck for the second time. (*See id.* at 92–94.) Stillwagon narrowly avoided a collision by swerving and slamming on his brakes. (*See id.*) Both vehicles came to a stop. (*See id.* at 94.) Mattingly then drove up the road and out of Stillwagon's sight. (*See id.* at 94, 101–02.)

## 2. Events on the Exit Ramp and in the AutoZone Parking Lot

Route 42 merges with Route 23 and turns into a four-lane divided highway as it approaches Delaware. (*See* Stillwagon Dep. Vol. I at 103–13 [ECF No. 200–1].) As Stillwagon approached Delaware, he saw Mattingly stopped at the traffic light at the merger; the light was green. (*See id.* at 103.) Stillwagon stayed back 200 to 300 meters and watched Mattingly. (*See id.* at 103–04.) When the light turned red, Stillwagon testified that Mattingly drove

through the intersection, narrowly avoiding a collision with a tanker truck, and onto the divided highway. (*See id.* at 106.) Stillwagon waited at two different traffic lights before entering the divided highway. (*See id.* at 106–07.)

An exit ramp on the right (east) side of the highway leads to William Street. (*See* Stillwagon Dep. Vol. I at 112–13.) The ramp forms its own lane. (*See id.*) As Stillwagon came to this portion of Route 42, he kept to the right to take the William Street exit. (*Id.*) Mattingly was ahead of Stillwagon at this point and driving north in the far left lane. (*See id.* at 113.) By Stillwagon's account, Mattingly was traveling slowly, around 10 miles per hour, and had roughly 20 cars backed up behind him. (*Id.*) Mattingly had almost passed the William Street exit, but instead of continuing on the highway, he made a sudden right turn, crossing two lanes of traffic and barely missing a concrete divider, to merge onto the ramp. (*See id.* at 114.) Stillwagon continued down the ramp a considerable distance behind Mattingly. (*See id.* at 115–16.)

Stillwagon approached the end of the ramp and saw Mattingly sitting under a green light at the William Street intersection. (Stillwagon Dep. Vol. I at 117.) The ramp is narrow and enclosed to the left by a concrete wall and to the right by a heavily wooded hill and a guardrail. (*See id.* at 123; William St. Ramp Photo at 1 [ECF No. 199–5].) Rather than drive past Mattingly, Stillwagon decided to wait on the right side of the exit ramp, 40 to 50 yards back from the truck. (Stillwagon Dep. Vol. I at 121.)

A few seconds after Stillwagon stopped, Stillwagon testified that the back-up lights on the truck lit up and the truck started backing up directly toward him. (*See* Stillwagon Dep. Vol. I at 126, 131–32.) Knowing that he had no room to maneuver on the ramp, Stillwagon retrieved his pistol and fired at the latch on the truck's tailgate. (*See id.* at 126–27.) Stillwagon fired three rounds. (*Id.* at 128.) He hit the center of tailgate, slightly above the latch, with two rounds. (*Id.*; Tailgate Photo at PageID 7901 [ECF No. 200–3].) The third round likely went into the ground; Stillwagon had pulled his pistol down when he saw Mattingly exiting the ramp. (*See* Stillwagon Dep. Vol. I at 128, 137–39) According to Stillwagon, Mattingly then quickly shifted out of reverse and turned right onto William Street through the red light. (*See id.* at 128, 133, 150.)

Stillwagon drove to the end of the ramp, and after waiting at the light, Stillwagon turned right onto William Street. (Stillwagon Dep. Vol. I at 151.) Until he turned, Stillwagon could not see to the right, down William Street. (*Id.* at 152.) After turning, however, Stillwagon testified that he saw Mattingly stopped on the Olentangy River bridge, straddling both eastbound lanes. (*See id.* at 153–54.)

To avoid Mattingly, Stillwagon testified that "made a radical left turn into the oncoming lane." (Stillwagon Dep. Vol. I at 154.) He claimed that he was attempting to reach the concrete base of a light pole stand (the "concrete pillar") that he could see in a parking lot just east of the bridge. (*See id.* at 154–55.) Immediately after Stillwagon started his left turn into the oncoming lane, Stillwagon testified that Mattingly accelerated, turned sharply to the left across William Street, cut in front of the motorcycle, and drove into the parking lot. (*See id.* at 155.) Mattingly turned to the left after entering the parking lot. (Eagles Video at 15:31:00 to 15:31:04.) He looped around the concrete pillar and stopped facing the road. (*Id.*) Stillwagon entered the parking lot seconds later; he drove directly to the concrete pillar to the left of the parking lot entrance. (*Id.* at 15:31:04 to 15:31:12.)

After reaching the concrete pillar, Stillwagon testified that he looked up and saw the truck several feet in front of him. (*See* Stillwagon Dep. Vol. I at 168–69.) The driver's side of the truck was facing Stillwagon. (Eagles Video at 15:31:13.) According to Stillwagon, Mattingly looked at him, revved the truck's engine, and started to leave the parking lot. (*See* Stillwagon Dep. Vol. I at 172–74, 177.) Speculating that Mattingly might try to bring the truck around the pillar, to the side where Stillwagon was unshielded, Stillwagon fired two rounds at the truck's rear driver-side tire. (*See id.* at 174.) One of the rounds hit the tire; the other round hit the back quarter panel behind the rear tire. (Wilgus Aff. ¶¶ 33, 35 [ECF No. 232–1].)

Mattingly exited the parking lot, turned left, and started heading east on William Street. (Eagles Video at 15:31:17 to 15:31:21.) But rather than driving away, Mattingly re-entered the parking lot farther to the east, maneuvered around a large planter, and drove directly toward Stillwagon. (*Id.* at 15:31:23 to 15:31:29.) Stillwagon had put down the kickstand and jumped off his motorcycle by this point. (*Id.*) There was nothing between him and the truck, as Mattingly had maneuvered the truck to the other side of the concrete pillar. (*Id.*) As the truck drove toward him, Stillwagon aimed for the truck's bumper and fired one shot. (*See* Stillwagon Dep. Vol. I at 187.) The bullet struck the wind deflector, below and to the left of the truck's front license plate. (Wilgus Aff. ¶ 37.) The truck then swerved to the left and came to a stop, facing William Street, about ten feet in front of Stillwagon. (Eagles Video at 15:31:28 to 15:31:31.)

The truck stopped and Stillwagon then walked to the truck's passenger-side door. (Eagles Video at 15:31:31.) He tried to open the door, but it was locked; he thought that he might be able to grab Mattingly and pull him out of the truck.

(*See* Stillwagon Dep. Vol. I at 189.) Mattingly, appearing agitated to Stillwagon, then purportedly kicked open the driver-side door and jumped out of the truck. (*Id.* at 194.) In an effort to close the proximity between him and Mattingly, Stillwagon quickly walked around the back of the truck, "using [it] as a barrier if [Mattingly] had a gun." (*Id.* at 189.)

As Stillwagon came around the back of the truck and approached Mattingly, Mattingly was facing east, with his back to the truck. (Stillwagon Dep. Vol. I at 195.) Stillwagon testified that Mattingly was yelling at him. (*Id.* at 199.) Stillwagon yelled back, indicating that he would shoot Mattingly if he had a gun in his right hand—the hand that was concealed from Stillwagon's view. (*See id.* at 200–01.) Stillwagon testified that Mattingly then quickly turned toward him; Stillwagon, in turn, grabbed Mattingly by the shoulder, kicked him in the knee, and hit him in the back of the head with his pistol, at which point the pistol discharged into the air. (*See id.* at 200–02.) Stillwagon then pushed Mattingly to the ground. (*See id.* at 210.) Mattingly attempted to stand up again, but Stillwagon ordered him to stay on the ground. (*See id.* at 248.) Stillwagon asked a bystander to call the police, and he set his pistol down on a nearby planter. (*Id.* at 251.)

### 3. Stillwagon's Detention and Arrest

Rashad Pitts, a Delaware County Sheriff's Deputy arrived first. Stillwagon waved Pitts over and acknowledged that he had fired the weapon. Stillwagon stated: "I shot the fucker. I don't think he's shot." (Pitts Cruiser Video at 15:36:48.) Stillwagon then indicated that Mattingly had just tried to kill him six times. (*Id.* at 15:36:51.) He informed Pitts that his pistol was sitting on the planter by the entrance to the parking lot, and he complied with Pitts's instructions to lie on the ground and to roll

onto his stomach. (*Id.* at 15:37:00 to 15:38:17.) Stillwagon did not resist as Pitts double cuffed him behind the back. (*Id.* at 15:38:17 to 15:38:43.)

When Pitts walked toward William Street to secure the pistol sitting on the planter, Defendant Ailes took charge of Stillwagon. (*See* Cruiser 62 Video at 15:39:56; Pitts Cruiser Video at 15:39:13.) Ailes decided that he would move Stillwagon and place him in the back of a police cruiser. (*See* Cruiser 62 Video at 15:39:56.) Ailes assisted Stillwagon to his feet, guided Stillwagon to a police cruiser, and then placed Stillwagon (by verbally directing him and physically pushing him) into the back seat of the cruiser while Stillwagon's hands were double cuffed behind his back. (*See* Cruiser 62 Video at 15:39:56 to 15:41:31; Pitts Cruiser Video at 15:39:56 to 15:40:21.)[3]

After placing Stillwagon in the back of the cruiser, Ailes asked Stillwagon to explain what happened. (Cruiser 62 Video at 15:41:42.) Stillwagon responded by describing the incident, from beginning to end, roughly as recounted above. (*See id.* at 15:41:51 to 15:49:00.) Several minutes later, and while Stillwagon was still in the back of the cruiser, Stillwagon explained to a different officer some of the events that took place in the parking lot. (*See* Cruiser 63 Video at 15:55:08 to 15:56:10.)

About four minutes later, Stillwagon was transported to the Delaware police station. (*See* Cruiser 63 Video at 16:00:00.) At the station, Defendant Flynn placed plastic evidence bags over Stillwagon's hands. (Flynn Dep. at 170 [ECF No. 53–1].) Flynn secured the bags with tape. (*Id.*; *see* Stillwagon Dep. Vol. II at 444 [ECF No.

200–2].) The bags were to preserve any gunshot residue on Stillwagon's hands. (Stillwagon Interview Tr. 1 at 2 [ECF No. 160–10].)

Defendants Segaard and Gerke interviewed Stillwagon at the station. Stillwagon described the incident from his first encounter with Mattingly on Route 42 to the final confrontation in the AutoZone parking lot. (*See, e.g.,* Stillwagon Interview Tr. 1 at 9–21.) Stillwagon's description was, again, roughly as recounted above, and it was consistent with the statement he had given Ailes in the parking lot. (*See, e.g.,* Stillwagon Interview Tr. 1 at 9–21; *see also* Cruiser 62 Video at 15:41:51 to 15:49:00.) The officers[4] found Stillwagon's description to be credible. (*See* Segaard Dep. Vol. I at 130 [ECF No. 160–1]; Stillwagon Interview Tr. 2 at 37 [ECF No. 160–11].)[5]

Gerke and Segaard also learned during the interview, through text messages from officers at the scene, the location of four of the five bullet holes in the truck. (Stillwagon Interview Tr. 2 at 44–45.) The locations corresponded with where Stillwagon said he shot the truck. (*See id.* at 35, 44–45; Stillwagon Interview Tr. 1 at 21.)

Aside from the information they obtained during the interview, Defendants Segaard, Gerke, Willauer, and Radabaugh were potentially aware of several other pieces of evidence: the final location of the truck and the motorcycle in the parking lot; the location of the shell casings in the AutoZone parking lot (i.e., next to the concrete pillar) and on the exit ramp (i.e., on the east side of the ramp and south of the painted turn arrow farthest from Wil-

---

**3.** The Court describes this event in more detail in the section below analyzing Stillwagon's § 1983 excessive force claim.

**4.** Although some of the police defendants are, or were, detectives, the Court uses the term

"officers," for simplicity, when referring to multiple police defendants.

**5.** The Court provides a more detailed description of Stillwagon's interview in the analysis of Stillwagon's § 1983 false arrest claim.

liam Street); that there was an empty shell casing in the chamber of Stillwagon's pistol; that no blood spatter consistent with a gunshot wound was found at the scene; that Mattingly had a blue metal baseball bat in his truck; that Mattingly had beer cans (at least one opened) in his truck; and that Mattingly smelled strongly of alcohol in the parking lot. (*See, e.g.,* Radabaugh Dep. Vol. I at 76–78 [ECF No. 193–1]; Radabaugh Dep. Vol. II at 205–09, 227, 240–41, 292–93 [ECF No. 196–1]; Segaard Dep. Vol. I at 33–34, 266; Wilgus Aff. ¶¶ 13–17 [ECF No. 232–1]; Willauer Dep. Vol. I at 91–94, 99–100, 103–04 [ECF No. 52–1].) [6]

Regarding the source of Mattingly's injury, the officers had acquired differing information. Segaard and Willauer heard, either from paramedics or other personnel on the scene, that Mattingly had been grazed in the head. (*See* Segaard Dep. Vol. I at 236–37; Willauer Dep. Vol. I at 98–99; Willauer Dep. Vol. II at 129–31 [ECF No. 157–1].) Stillwagon, by contrast, told Segaard and Gerke that he had kicked Mattingly in the leg and then hit Mattingly on the head with his hand and pistol. (*See* Stillwagon Interview Tr. 2 at 51.) Mattingly was reportedly alert and talking at the scene. (Segaard Dep. Vol. I at 75–76; Willauer Dep. Vol. II at 129.)

A surveillance camera at the Eagles Lodge recorded the events in the AutoZone parking lot. Segaard and Radabaugh may have watched the surveillance video before Stillwagon's arrest. (*See* Radabaugh

Dep. Vol. I at 91–93.) The video shows, among other things, Mattingly leave and then re-enter the parking lot, maneuver around a large planter, and drive directly toward Stillwagon. (Eagles Video at 15:31:23 to 15:31:29.) The video also shows Stillwagon walk to the passenger-side door of the truck, pause, and then, without stopping or taking a shooting stance, walk around the back of the truck and toward the driver-side door, where Stillwagon makes what appears to be a downward motion with his arm. (*Id.* at 15:31:31 to 15:31:49.)

Near the time of Stillwagon's interview, Segaard has testified that he conversed with several people—including, potentially, Radabaugh, Gerke, and Delaware Police Chief Bruce Pijanowski—outside the interview room. (*See* Segaard Dep. Vol. I at 29–30, 149–50; Segaard Dep. Vol. II at 526–27 [ECF No. 162–1].) [7] Following this group conversation, and after concluding Stillwagon's interview, Segaard instructed Willauer to prepare and file a felonious assault charge against Stillwagon. (*See* Segaard Investigation Report at PageID 4578 [ECF No. 160–4].) Stillwagon, who had been in police custody since his detention in the parking lot, was formally arrested that evening at 8:48 p.m. (*See* Release Report at 1 [ECF No. 205–1].) Stillwagon considers this to be the point at which he was falsely arrested. (Pl.'s First Mot. for Summ. J. at 2 [ECF No. 205].) [8]

Segaard and Gerke attempted to speak with Mattingly that evening. (Segaard In-

---

**6.** The evidence indicates that one or more of the officers knew each of these facts. It is uncertain though whether the officers learned about certain pieces of information before or after Stillwagon's arrest. (*See, e.g.,* Radabaugh Dep. Vol. I at 76–78; Radabaugh Dep. Vol. II at 205–09, 227; Segaard Dep. Vol. I at 266.)

**7.** The evidence is unclear whether Radabaugh, Gerke, and Pijanowski participated in this conversation or in the decision to arrest

and prosecute Stillwagon. (*See* Gerke Dep. Vol. I at 89 [ECF No. 58–1]; Radabaugh Dep. Vol. II at 190–91, 204–05 [ECF No. 196–1]; Segaard Dep. Vol. I at 29–30, 149–50; Segaard Dep. Vol. II at 526–27.)

**8.** Stillwagon does not assert a false arrest claim regarding the "the initial investigatory period in which he was detained." (Pl.'s First Mot. for Summ. J. at 2.)

vestigation Report at PageID 4578.) However, they learned while in route to the hospital that Mattingly had left without being discharged. (*Id.*) The officers continued to the hospital anyway; they hoped to learn more about Mattingly's condition. (*Id.*) They were unable, though, to obtain Mattingly's medical records. (*Id.*)

Segaard later spoke with Mattingly on the phone. (Segaard Investigation Report at PageID 4578.) Mattingly did not seem particularly interested in participating in the investigation. (*Id.*)

#### 4. Stillwagon's Prosecution

At 8:04 a.m. the next day, October 1, 2012, Willauer filed a criminal complaint against Stillwagon alleging that he committed felonious assault when he "knowingly attempt[ed] to cause serious physical harm to [Mattingly] by discharging a firearm at him at least six times, ultimately striking [him] in the head." (Crim. Compl. at 1 [ECF No. 205s–2].)

In the days following Stillwagon's arrest and the filing of the criminal complaint, Segaard, Gerke, Willauer, and Radabaugh obtained additional information about the incident.

##### a. Witness Statements

The officers received statements from several witnesses to the events on Route 42 and the confrontation in the AutoZone parking lot.

Lois Reninger—one of the two people who stopped to talk with Stillwagon near Watkins/Moore Road—corresponded with Segaard by phone and email. (*See* Oct. 2, 2012 Reninger Email at PageID 5111 [ECF No. 162–6].) She watched Mattingly pass and then brake check Stillwagon. (Oct. 1, 2012 Reninger Email at PageID 5110 [ECF No. 162–6].) She then stopped,

along with another motorist, to check on Stillwagon; they were by the side of the road for three to five minutes. (*Id.*) Stillwagon appeared to be shaken and "was almost in his own world." (*Id.*) She confirmed that the other motorist called the police and that Stillwagon did not want to wait to file a report. (*Id.*) She heard Stillwagon quietly say to himself that he would "[g]et the son of a bitch." (*Id.* (internal quotation marks omitted).) And when Stillwagon re-entered the road. Reninger observed that he made "a normal entry." (*Id.*) Reninger re-entered the road after Stillwagon. Farther up Route 42, near Section Line Road, she observed a silver pick-up truck (like Mattingly's) pull onto Route 42 and head north. (Oct. 2, 2012 Reninger Email at PageID 5111.)

Tina Bickham and Kevin Cogan also communicated with Segaard. They witnessed Mattingly driving north in Route 42's southbound lane. (*See* Bickham Call at 3–5 [ECF No. 162–3]; Cogan Call at 4–8 [ECF No. 162–10].) And they were each forced to drive off the road to avoid a collision with Mattingly's truck. (*See* Bickham Call at 3–5; Cogan Call at 4–8.)

Ruth Sayre contacted Segaard too. She witnessed Mattingly chase and cut in on Stillwagon on Route 42. (*See* Sayre Call at 4–5 [ECF No. 205–5].) Based on this observation, she suggested that Mattingly's story (disseminated on the news) of his truck suffering mechanical problems was likely untrue. (*See id.* at 5, 11.)

Daniel Powell, Chris Linkous,[9] William Brown, and Susan Orcena each observed the events in the AutoZone parking lot and provided statements to the police. Powell's account was consistent with the events recorded on the Eagles Lodge video. (*See* Eagles Video at 15:31:31 to 15:31:49.) The

---

9. Chris Linkous's last name is apparently "Renkes." (Pl.'s First Mot. for Summ. J. at 75 [ECF No. 205].) The Court uses "Linkous" though because almost all of the documents in the case use that name.

other witnesses' statements, by contrast, are each contradicted in critical ways by the Eagles Lodge video. (*See id.*)

Powell described Mattingly leaving and re-entering the parking lot. (Cruiser 66 Video at 15:40:53 to 15:41:04.) And he described Stillwagon approaching and then hitting Mattingly on the head with a gun, at which point the gun fired. (*Id.* 15:41:04 to 15:41:12.)

Observing the events through the rear-view mirror of his car, which was parked in front of AutoZone, Linkous claimed to see Mattingly run from the driver side to the passenger side of the truck. (Linkous Call at 3 [ECF No. 162–8].) And according to Linkous, Stillwagon then shot at Mattingly, Mattingly went down, and Stillwagon shot again. (*Id.*) The Eagles Lodge video, however, does not show Mattingly run to and fall to the ground by the passenger side of the truck (*See* Eagles Video at 15:31:31 to 15:31:49.)

Brown was at AutoZone's front window. (Brown Call at 2 [ECF No. 159–13].) He claimed to see Stillwagon ride his motorcycle to the passenger side of the truck, fire a shot at the truck, park the motorcycle, take aim (through the passenger side of the truck), and fire at Mattingly, take a couple of steps forward, take aim, and again shoot through the passenger side of the truck, walk a bit closer and again fire at the passenger side of the truck, walk around the back of the truck and halfway up the driver side of the truck, and then fire two more shots at Mattingly. (*Id.* at 3–4.) In contrast to this account, the Eagles Lodge video simply shows Stillwagon walk to the truck's passenger-side door, pause, and then walk around the rear of the truck to the driver-side door. (*See* Eagles Video at 15:31:31 to 15:31:49.)

Orcena was riding in a car with her husband, traveling east on William Street. (Orcena Second Statement at PageID 4598 [ECF No. 160–5].) As their vehicle ap-

proached the off ramp from Route 23, they heard gunfire. (*Id.*) Her husband stopped the car. (*Id.*) Orcena claimed to see Mattingly exit and "walk[ ] around to the side of the truck." (*Id.*) In an initial statement, Orcena claimed that she then heard a shot and saw Mattingly fall to the ground. (Orcena First Statement at PageID 5205 [ECF No. 162–12].) In a later statement, however, Orcena claimed to see Stillwagon approach Mattingly, take direct aim from eight to ten feet away, and shoot him. (Orcena Second Statement at PageID 4598.) Orcena stated that her husband then pulled into a parking lot on the south side of William Street and dialed 911. (*Id.*) The Eagles Lodge video does not depict Mattingly walk around the side of the truck, nor does it depict Stillwagon taking direct aim at Mattingly from eight to ten feet away. (Eagles Video at 15:31:31 to 15:31:49.) The Eagles Lodge video also does not show a car stopped in the eastbound lane across from the AutoZone parking lot. (*Id.* at 15:30:55 to 15:32:00.) An eastbound car does, however, eventually turn into a parking lot on the south side of William Street. (*Id.* at 15:31:51 to 15:31:57.)

#### b. Mattingly

In the days after the incident, the officers also spoke with Mattingly. He was interviewed twice: first by Segaard and then by Segaard and Gerke. Mattingly began the first interview by providing a brief, generalized description of the incident. He stated that he was traveling to visit his dad when Stillwagon passed him and started braking. (Mattingly Interview Tr. 1 at 4, 6 [ECF No. 155–5].) Stillwagon was annoyed, Mattingly surmised, about how slow Mattingly was driving. Mattingly averred that his truck was experiencing various mechanical problems ("drawing power, shorting and pulling"), which caused him to drive slowly and, later, erratically. (*See id.* at 6.) Mattingly stated

that he tried to communicate his mechanical problems to Stillwagon using hand gestures. (*Id.* at 8–9.) The effort was unsuccessful though, as farther up the road, at the exit ramp to William Street, Stillwagon shot at his truck. (*See id.* at 7–9.) Mattingly attempted to take refuge in the Auto-Zone parking lot. (*Id.* at 7.) But Stillwagon allegedly pulled in beside him and started shooting into the passenger side of the truck. (*Id.*) Mattingly got out of the truck, and Stillwagon purportedly came around the back of the vehicle firing his weapon and saying "you're dead, you're dead, you're dead." (*Id.*) Mattingly could not remember any more of the encounter. (*Id.* at 7–8.)

Later in the interview, and in response to Segaard's various follow-up questions, Mattingly again discussed the events in the AutoZone parking lot. (Mattingly Interview Tr. 1 at 38.) Segaard asked Mattingly why, after seemingly fleeing, he re-entered the parking lot. (*Id.* at 39.) Mattingly stated that he did not remember re-entering the parking lot; he suggested though that he was probably just scared. (*Id.* at 39–40.) Regarding the injuries he sustained, Mattingly again stated that he exited the truck and heard Stillwagon yelling; he could not remember anything else though. (*See id.* at 41–43.) Mattingly speculated that he must have ducked and cringed for a bullet to have hit him in the back of the head. (*See id.* at 42.)

Segaard and Gerke began the second interview by insisting that Mattingly stop feigning memory loss and tell the truth; throughout the process, they repeatedly referenced the purported fact that Mattingly had been shot in the head. (*See, e.g.,* Mattingly Interview Tr. 2 at 10, 13–14, 16–17, 19, 32, 41–43, 77 [ECF Nos. 184–3, 184–4].) Following this discussion, Mattingly offered additional details.

Mattingly reiterated that Stillwagon came around the back of the truck and shot at him from eight to ten feet away. (*See* Mattingly Interview Tr. 2 at 73–75, 77.) Mattingly remembered "the shots," the "sound of it," the "look of the barrel," the "look of [Stillwagon's] face," the "whole image." (*Id.* at 77–78.) Mattingly stated that he then went unconscious. (*Id.* at 75, 77.) Mattingly opined that the only physical contact between him and Stillwagon would have been when he was already on the ground. (*Id.* at 76.)

Segaard and Gerke tried to obtain a further explanation from Mattingly about his departure and re-entry to the Auto-Zone parking lot. (*See* Mattingly Interview Tr. 2 at 5–7, 79–80.) Mattingly initially implied that he still did not remember the event and that he must have been acting out of fear. (*See id.* at 5–7.) After the officers' admonition that he should stop feigning memory loss and tell the truth, Mattingly indicated that he was confused at the time about where Stillwagon was. (*See id.* at 79–80.)

Mattingly admitted during the second interview to drinking beer before and during the events on Route 42. (*See* Mattingly Interview Tr. 2 at 19–20, 48–49.) He acknowledged that his truck's back-up lights might have come on when he was stopped at the end of the William Street exit ramp, but he insisted that his truck did not move backwards. (*Id.* at 68–69.) And he told the officers that he and Stillwagon both engaged in aggressive behavior on Route 42. (*See, e.g., id.* at 14, 20, 50–58.)

Mattingly continued to insist that his truck was experiencing mechanical problems. (Mattingly Interview Tr. at 17, 35, 51.) He also continued to insist that he could not remember certain events, or their sequence. (*See, e.g., id.* at 52, 61, 63–65, 67–68, 73, 78.) And in various instances, when Segaard or Gerke asked Mattingly about a specific event, Mattingly simply speculated about his actions. (*See, e.g., id.* at 53, 61, 64–65, 67–68.)

. The officers did not find Mattingly's account to be especially trustworthy—particularly the part addressing the events on Route 42. (*See* Segaard Investigation Report at PageID 4579 [ECF No. 160–4]; *see also* Segaard Dep. Vol. II at 471–72 [ECF No. 162–1].)

The officers also obtained additional information about Mattingly's injuries. During his first interview, Mattingly stated that his knee hurt and was swollen. (Mattingly Interview Tr. 1 at 4.) Although he did not remember injuring his knee, Mattingly speculated that he must have fallen on it after losing consciousness. (*See id.*) Segaard viewed Mattingly's head injury: it was at the base of Mattingly's skull, and "there did not appear to be any swelling or scorching that would have indicated ... that he was either hit on the head or that his head had been exposed to a discharging firearm at point blank range." (Segaard Investigation Report at PageID 4579–80.) And a police evidence technician also viewed Mattingly's head wound: there was "no stippling, scorch marks or anything else [indicative of] a point blank bullet wound," nor was there swelling consistent with a blunt for impact. (*Id.* at PageID 4580.)

### c. Investigation Reports, Indictment, and Trial

By October 5, 2012, Segaard, Gerke, Willauer, Flynn, and Ailes had filed their investigation reports about the incident. (*See* Investigation Reports at PageID 4566–91 [ECF No. 160–4].) And Segaard, in addition to drafting his report, compiled a Grand Jury Packet and developed a Grand Jury Synopsis PowerPoint. (*See* Grand Jury Packet at PageID 4559 [ECF No. 160–4]; Grand Jury Synopsis at 1 [ECF No. 165–1].)

Nearly four months after the incident, on January 29, 2013, Segaard testified before the Delaware County grand jury. (Segaard Dep. Vol. IV at 911 [ECF No. 199–1].) Stillwagon was indicted on four counts of felonious assault. (Indictment at 1–4 [ECF No. 203–2].) A Bill of Particulars later clarified that three of the indicted counts alleged that Stillwagon had attempted to shoot Mattingly; the fourth count alleged that Stillwagon had used his pistol to cause serious physical harm to Mattingly. (Bill of Particulars at 1–2 [ECF No. 205–8].)

Stillwagon's criminal case went to trial on October 1, 2013. (*See* J. Entry at 1 [ECF No. 205–9].) Finding no evidence in the record that could support a conviction, the trial court dismissed each of the counts brought against Stillwagon and entered a judgment of acquittal pursuant to Ohio Criminal Rule 29. (*See id.*)

### B. Procedural Background

Stillwagon filed his complaint in the '807 case on July 10, 2014, and he filed his complaint in the '1606 case on September 18, 2014. Following the Court's March 31, 2016 Opinion and Order on the Municipal Defendants' Motion for Judgment on the Pleadings, Stillwagon filed, on May 16, 2016, an amended complaint in the '807 case. The Court has since consolidated the '807 and '1606 cases for all purposes, including trial.

As relevant here, Stillwagon asserts nine claims: claims under 42 U.S.C. § 1983 for (1) false arrest (against Segaard, Willauer, Gerke, and Radabaugh); (2) malicious prosecution (against Segaard, Willauer, Gerke, and Radabaugh); (3) civil conspiracy (against Segaard, Willauer, Gerke, and Radabaugh);[10] (4) supervisory liability

10. Stillwagon also brings his § 1983 civil conspiracy claim against Mattingly. (Am.

Compl. ¶ 172 [ECF No. 78].)

(against Radabaugh); [11] (5) excessive force (against Ailes and Flynn); and (6) municipal liability (against the City); as well as claims under Ohio law (against Segaard, Willauer, Gerke, and Radabaugh) for (7) malicious prosecution; (8) civil conspiracy; and (9) spoliation of evidence. (Am. Compl. ¶¶ 169–192 [ECF No. 78].) [12] Stillwagon is suing Segaard, Willauer, Gerke, Radabaugh, Ailes, and Flynn in their individual capacities. (*Id.* ¶ 18; '1606 Compl. ¶ 5 ['1606 ECF No. 1].)

Following extensive discovery, the parties filed the cross-motions for summary judgment that are currently before the Court. The Municipal Defendants have moved for summary judgment on all the claims asserted against them. Stillwagon, in turn, has filed three motions for summary judgment. In his first motion, Stillwagon requests summary judgment against Segaard and Willauer on his false arrest claim and malicious prosecution claims (under § 1983 and Ohio law). (Pl.'s First Mot. for Summ. J. at 1 [ECF No. 205].) In his second motion, Stillwagon requests summary judgment against Ailes and Flynn on his excessive force claim. (Pl.'s Second Mot. for Summ. J. at 1 [ECF No. 206].) And in his third motion, Stillwagon requests summary judgment against the City on his municipal liability claim relating to excessive force. (Pl.'s Third Mot. for Summ. J. at 1 [ECF No. 207].)

Two additional motions relating to the parties' summary judgment filings are also before the Court. The Municipal Defendants have moved to strike a catalog of evidence submitted as an exhibit by Stillwagon. (Defs.' Mot. to Strike at 1 [ECF No. 231].) And the Municipal Defendants have moved to exclude two paragraphs

from an affidavit submitted by one of Stillwagon's experts. (Defs.' Mot. to Exclude at 1 [ECF No. 232].)

The Court first considers the Municipal Defendants' Motion to Strike.

## II. MOTION TO STRIKE

The Municipal Defendants request that the Court strike, and decline to consider for purposes of the pending motions for summary judgment, a catalog of evidence submitted by Stillwagon as an exhibit to his Memorandum in Opposition [ECF No. 220] to the Municipal Defendants' Motion for Summary Judgment. (Mot. to Strike at 1 [ECF No. 231].) The catalog is a list of the alleged "false statements, falsified or fabricated evidence and misleading omissions by Defendant police officers." (Catalog at 1 [ECF No. 220–2].) The Municipal Defendants contend that the catalog fails to comply with Federal Rule of Evidence 1006, which provides, in relevant part, that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006.

Federal Rule of Civil Procedure 56(c)(2) "governs the procedure by which courts must review objections to the admissibility of evidence presented in connection with a motion for summary judgment." *Smith v. Interim HealthCare of Cincinnati, Inc.*, No. 1:10–cv–582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2, 2011). Under that rule, a party may object if it believes that materials cited in support of a motion for summary judgment "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P.

---

11. Stillwagon no longer brings a supervisory liability claim against Willauer. (Pl.'s Opp'n to Mot. for Summ. J. at 1 [ECF No. 220].)

12. Stillwagon brought a failure to protect claim as part of the '1606 case. He has since stated, however, that he no longer asserts that claim. (Pl.'s Opp'n to Mot. for Summ. J. at 1.)

56(c)(2). A party's objection under Rule 56(c)(2) "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* (2010 Advisory Committee notes). A party need not file a separate motion to strike when challenging evidence submitted in support of a motion for summary judgment. *Id.* If a party does file a separate motion to strike, the motion should be construed as an objection under Rule 56(c)(2). *Smith*, 2011 WL 6012971, at *4.

The Municipal Defendants' Motion to Strike, which the Court construes as an objection under Rule 56(c)(2), consists of two request: (1) that the Court decline to consider the catalog as it decides the parties' motions for summary judgment and (2) that the Court strike the catalog from the docket. The Municipal Defendants' first request has merit. Stillwagon acknowledges in his response to the Motion to Strike that the catalog "is not evidence under [Federal Rule of Evidence] 1006" and "was never intended to be considered as such." (Opp'n to Mot. to Strike at 3 [ECF No. 243].) Based on this acknowledgment, the Court grants the Municipal Defendants' Motion in part and will not consider the catalog as it decides the parties' motions for summary judgment.[13]

The Municipal Defendants' second request is less successful. Defendants point to no legal authority authorizing the Court to strike an exhibit from the docket under Rule 56. Indeed, the Civil Rules Advisory Committee's notes, coupled with case law interpreting the Rule, appear to contradict the argument that the Court can strike an exhibit under Rule 56. The Advisory Committee explicitly stated that "[t]here is no

need to make a separate motion to strike" when objecting to materials cited in support of a motion for summary judgment. Fed. R. Civ. P. 56 (2010 Advisory Committee notes). And courts have clarified that a motion to strike such materials should be construed as an *objection* under Rule 56(c)(2). The Municipal Defendants' Motion to Strike is therefore denied to the extent that it asks the Court to strike Stillwagon's catalog from the docket.

## III. MOTION TO EXCLUDE

The Municipal Defendants have moved to exclude paragraphs 39 and 40 of an affidavit submitted by Gary Wilgus, a crime scene investigator and expert witness for Stillwagon. (Mot. to Exclude at 1 [ECF No. 232].) In the challenged paragraphs, Wilgus states:

39. Based upon the information listed above concerning the bullet holes, their locations, patterns and directionality, the physical evidence all supports that Mr. Stillwagon made no attempt to shoot at the driver of the truck. As to every shot fired, Mr. Stillwagon was intentionally aiming at the truck, not the driver. Assuming that the shots in the tailgate came first, the shots to the rear driver's side second, and the shot to the front of the truck was last, each time Mr. Stillwagon fired the weapon, the bullets struck lower on the truck and thus further from the driver. Assuming that Mr. Stillwagon is competent with the firearm, the physical evidence renders the theory that he was attempting to shoot the driver entirely implausible.

40. If the Delaware Police Department had requested my conclusions at the time of the investigation, regarding the analysis of the shooting-related evi-

---

**13.** The Municipal Defendants do not object to, and the Court will still consider, the docu-ments listed in the catalog.

dence, I would have told them that it was my opinion that Mr. Stillwagon was aiming at the truck, not the driver. It was clear to me from day one there was no attempt to actually shoot at the driver himself. However, I was not asked to provide[ ] my analysis or conclusions on this issue.

(Wilgus Aff. ¶¶ 39, 40 [ECF No. 232–1].) The Municipal Defendants challenge these paragraphs, arguing that (i) Wilgus is not qualified to offer opinions regarding Stillwagon's state of mind at the time he fired the shots, (ii) any methodology employed by Wilgus in forming these opinions is unreliable, and (iii) Wilgus's opinions will not assist the factfinder. (Mot. to Exclude at 1.)

Federal Rule of Evidence 702 governs the use of expert testimony. Under the Rule, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:"

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The trial judge is the 'gatekeeper' of expert evidence and determines its admissibility under Rule 702." *Palatka v. Savage Arms, Inc.*, 535 Fed. Appx. 448, 453 (6th Cir. 2013) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). And as the gatekeeper, a trial judge has discretion to determine the admissibility of a proposed expert's testimony " 'based on whether the testimony is both relevant and reliable.' " *Id.* (quoting *Rose v. Truck Ctrs., Inc.*, 388 Fed.Appx. 528, 533 (6th Cir.

2010)). When considering the admissibility of particular expert testimony, the trial judge "must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology can be applied to the facts in issue.' " *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

The Court agrees with the Municipal Defendants that paragraphs 39 and 40 of Wilgus's affidavit should be excluded. The testimony Wilgus provides in those paragraphs on Stillwagon's intentions in firing his pistol represents an exercise in drawing inferences from the facts of the case. And as this Court has explained previously, " '[t]he jury is sufficiently capable of drawing its own inferences regarding intent, motive or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful for the jury.' " *Waite, Schneider, Bayless & Chesley, L.P.A. v. Davis*, 253 F.Supp.3d 997, 2015 WL 3505793, at *14 (S.D. Ohio 2015) (quoting *Siring v. Or. State Bd. of Higher Educ.*, 927 F.Supp.2d 1069, 1077 (D. Or. 2013)); *see also CMI–Trading v. Quantum Air*, 98 F.3d 887, 890 (6th Cir. 1996) ("The intent of the parties is an issue within the competence of the jury and expert opinion testimony will not assist the jury, within the meaning of Federal Rule of Evidence 702, in determining the factual issue of intent.").

Stillwagon suggests that Wilgus was not opining about intent. (*See* Opp'n to Mot. to Exclude at 6 [ECF No. 242].) According to Stillwagon, Wilgus's "opin-

ions are that the physical evidence strongly contradicts the theory that [Stillwagon] was attempting to shoot [Mattingly]." (*Id.*)

Stillwagon's argument offers an incomplete picture of Wilgus's testimony. Wilgus opines that "the physical evidence renders the theory that [Stillwagon] was attempting to shoot the driver entirely implausible." (Wilgus Aff. ¶ 39.) But Wilgus also avers that "as to every shot fired, Mr. Stillwagon was intentionally aiming at the truck, not the driver." (*Id.*) With this second statement, Wilgus clearly offers an opinion about intent.

Ultimately though, Stillwagon points to a distinction without a difference. Regardless of how Wilgus's testimony is cast, Wilgus is still drawing inferences from the facts of the case—inferences that the jury needs no assistance in drawing. Accordingly, the Court grants the Municipal Defendants' Motion and will exclude paragraphs 39 and 40 of Wilgus's affidavit from its consideration in ruling on the parties' cross-motions for summary judgment.[14]

## IV. CROSS–MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). When the moving party has carried this burden, the nonmoving party

must then set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

"After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In evaluating a motion for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate

---

14. To be clear, as this issue may resurface at trial, the Court addresses only paragraphs 39 and 40. Physical findings or other testimony independent of a party's state of mind are left for another day.

that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

Stillwagon asserts several claims under 42 U.S.C. § 1983, which provides a remedy for "the deprivation of rights, privileges, or immunities secured by the Constitution and laws" with respect to actions taken by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. To prevail on a claim brought under § 1983, a plaintiff must prove (1) that he was deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

### A. Request to Strike Stillwagon's Memorandum in Opposition

The Municipal Defendants have, as a preliminary matter, requested that the Court strike Stillwagon's Memorandum in Opposition [ECF No. 220] to their Motion for Summary Judgment. (Defs.' Reply in Supp. of Mot. for Summ. J. at 1 [ECF No. 233].) The Memorandum was due on Friday, May 5, 2017, but was not filed until Saturday, May 6. (*Id.*) When, as here, a request to strike falls outside the scope of Federal Rule of Civil Procedure 12(f), which provides for striking matters from "a pleading," the Court relies on its

inherent power to control the docket when deciding whether to strike the document. *Hill v. Ohio State Univ. T & L*, No. 2:12-cv–984, 2013 WL 2354069, at *2 (S.D. Ohio May 29, 2013); *see Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 516–17 (6th Cir. 2003).

The Court denies the request to strike. Stillwagon filed his Memorandum just one day late. The Municipal Defendants do not claim to have suffered any prejudice from the late filing. (*See* Defs.' Reply in Supp. of Mot. for Summ. J. at 1.) And, in fact, the Municipal Defendants have not identified any reason, aside from the mere fact that the filing was late, why the Court should strike the Memorandum. (*See id.*) Striking Stillwagon's Memorandum under these circumstances would constitute a disproportionately harsh sanction. And striking the Memorandum would neither benefit the Court's docket management nor help to resolve the case more expeditiously.

The Court moves now to the substance of the motions for summary judgment.

### B. False Arrest

The parties have filed cross-motions for summary on Stillwagon's § 1983 false arrest claim. A false arrest claim implicates "the Fourth Amendment right to be arrested only upon probable cause." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579–80 (6th Cir. 2003). Prevailing on the claim thus " 'requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.' " *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005)).

Probable cause exists when the police have " 'reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the [suspect]

had committed ·or was committing an offense.'" *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). "No overly burdensome duty to investigate applies to officers faced with the prospect· of a warrantless arrest." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007). Nonetheless, "'[p]robable cause determinations involve an examination of all [the] facts and circumstances within an officer's knowledge at the time of an arrest.'" *Gardenhire*, 205 F.3d at 315 (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)). That is, "the initial probable cause determination must be founded on. 'both the inculpatory *and* exculpatory evidence' known to the arresting officer." *Logsdon*, 492 F.3d at 341 (quoting *Gardenhire*, 205.F.3d at 318). An officer "cannot simply turn a blind eye toward potentially exculpatory evidence." *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). With respect to: affirmative defenses, "where a reasonable police officer would conclusively know that [a suspect's] behavior is protected by a legally cognizable affirmative· defense, that officer lacks a legal foundation to arrest that person for that behavior." *Painter v. Robertson*, 185 F.3d 557, 571 & n.21 (6th Cir. 1999) ("[A] peace officer, in assessing probable cause to effect an arrest, may not ignore information known to him which proves that the suspect is protected by an affirmative legal justification for his suspected criminal actions."). "[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

### 1. The Municipal Defendants' Motion for Summary Judgment

■■■■ The Municipal Defendants contend that Segaard, Willauer, Gerke, and Radabaugh are entitled to qualified immunity and, thus, summary judgment. (*See* Defs.' Mot. for Summ. J. at 11–18 [ECF No. 203].) Under the doctrine of qualified immunity, "'government officials performing discretionary functions, generally are shielded from liability from civil damages insofar as their conduct does not violate clearly· established statutory or constitutional rights of which a reasonable person would have known.'" *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Determining whether qualified immunity shields a defendant from liability is a question of law involving a two-step inquiry. "First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred." *Id.* If a violation could be established, the next step is to determine whether the statutory or constitutional right was clearly established. *Id.* When a defendant raises qualified immunity as an affirmative defense, the plaintiff bears the burden of demonstrating that the officer is not entitled to the defense. *Moldowan*, 578 F.3d at 375. ·

### a. Constitutional Violation

■■■■ The officers are entitled to qualified immunity, the Municipal Defendants argue, because the Sixth Circuit routinely grants qualified immunity in cases where, despite the suspect's assertion of an affirmative defense, the facts known to the arresting officer track the elements of an offense. (Defs.' Mot. for Summ. J. at 17.) The Municipal Defendants' statement of the law is accurate. But it is not controlling in this case. The cases decided by the Sixth Circuit, 'and cited by the Municipal Defendants, involved situations where the evidence did not present a genuine issue of material fact on whether a reasonable police officer would have conclusively known that the affirmative defense applied. *See Harvey· v. Carr*, 616 Fed.Appx. 826, 829

(6th Cir. 2015). This case, by contrast (and as discussed below), involves evidence that creates a genuine issue of material fact on whether a reasonable officer would have conclusively known that Stillwagon acted in self-defense and, more broadly, on whether probable cause existed to arrest Stillwagon.

To determine whether the officers had probable cause to arrest Stillwagon, the Court considers whether the totality of the facts and circumstances known to the officers at the moment of arrest was sufficient to warrant a prudent person in believing that Stillwagon had committed an offense. *See Sykes*, 625 F.3d at 306; *see also United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) (" '[T]he collective knowledge of agents working as a team is to be considered together in determining probable cause.' " (quoting *United States v. Woods*, 544 F.2d 242, 259–60 (6th Cir. 1976))).[15]

### i. Information Known at the Time of Arrest

When Stillwagon was arrested on the evening of September 30, 2012, Segaard, Gerke, Willauer, and Radabaugh were operating on a limited amount of information. The officers knew: the final location of the truck and the motorcycle in the parking lot; the location of the shell casings in the AutoZone parking lot (i.e., next to the concrete pillar) and on the exit ramp (i.e.,

on the east side of the ramp and south of the painted turn arrow farthest from William Street); the location of at least four of the five bullet holes in Mattingly's truck (i.e., two in the tailgate, one in the rear driver-side tire, and one in the quarter panel behind that tire); that there was an empty shell casing in the chamber of Stillwagon's pistol (potentially suggesting that the pistol was in contact with something when it was last fired); that no blood spatter consistent with a gunshot wound was found at the scene; that Mattingly had a blue metal baseball bat in his truck; that Mattingly had beer cans (at least one opened) in his truck, and that Mattingly was alert, talking, and smelled strongly of alcohol at the parking lot. (*See, e.g.*, Radabaugh Dep. Vol. I at 76–78 [ECF No. 193–1]; Radabaugh Dep. Vol. II at 206–09, 227, 240–41, 292–93 [ECF No. 196–1]; Segaard Dep. Vol. I at 33–34, 75–76, 266 [ECF No. 160–1]; Stillwagon Interview Tr. 2 at 44–45 [ECF No. 160–11]; Wilgus Aff. ¶¶ 13–17 [ECF No. 232–1]; Willauer Dep. Vol. I at 91–94, 99–100, 103–04 [ECF No. 52–1]; Willauer Dep. Vol. II at 129 [ECF No. 157–1].)[16] When viewed in the most favorable light, the evidence also shows that Segaard and Radabaugh viewed the Eagles Lodge surveillance video before Stillwagon's arrest. (*See* Radabaugh Dep. Vol. I at 91–93, 98–100; Segaard Dep. Vol. I at 125.)[17] And, finally, Segaard and Gerke

---

15. The Municipal Defendants do not dispute the individual officers' direct participation in Stillwagon's alleged false arrest and malicious prosecution. And, in any event, Stillwagon has produced sufficient evidence to create a question for the jury on the issue. (*See* Crim. Compl. at 1 [ECF No. 205–2]; Segaard Dep. Vol. I at 149–50 [ECF No. 160–1]; Segaard Dep. Vol. II at 526–27 [ECF No. 162–1]; Segaard Investigation Report at PageID 4578 [ECF No. 160–4].)

16. The evidence indicates that one or more of the officers knew each of these facts. It is uncertain though whether the officers learned about certain pieces of information before or

after Stillwagon's arrest. (*See, e.g.*, Radabaugh Dep. Vol. I at 76–78; Segaard Dep. Vol. I at 266.) Also, some of this information may have been known only by Radabaugh or Gerke, whose participation in the decision to arrest Stillwagon is disputed. (*See* Gerke Dep. Vol. I at 89 [ECF No. 58–1]; Radabaugh Dep. Vol. II at 190–91, 204–05; Segaard Dep. Vol. I at 149–50; Segaard Dep. Vol. II at 526–27.) Consequently, this list represents the most favorable view of the information known to the officers at the time of Stillwagon's arrest.

17. Because Segaard and Radabaugh potentially had access to the video by the evening of September 30, but could not recall in their

knew—and largely believed—what Stillwagon told them during his interview at the police station. (*See* Segaard Dep. Vol. I at 130; Stillwagon Interview Tr. 2 at 37.)

The events started, Stillwagon explained in his interview, after he left the Marathon station at the intersection of Routes 42 and 33: "I filled up, got on the road, and I was just—I was going 50 miles an hour. I remember right when I got over this, what 33 and this car—this truck misses me by five inches. I was going about 50, he was going about 70. Holy shit. Then all of a sudden he stops up in here and waits for me to come up. So I stayed back and ... so that happened all the way up ...." (*See* Stillwagon Interview Tr. 1 at 10–11 [160–10].) Stillwagon described in detail Mattingly's aggressive passing, brake checking, swerve-ins, bat-waiving, and other maneuvers. (*See, e.g., id.* at 9–21.) Stillwagon emphasized that Mattingly had repeatedly tried to kill him. (*See, e.g., id.* at 12, 21.)

Stillwagon indicated that he had made numerous efforts to separate himself from Mattingly while on the highway. (*See, e.g.,* Stillwagon Interview Tr. 1 at 9–21.) Most notably, Stillwagon stated that he pulled over and waited several minutes "to let the guy go on up the road." (Stillwagon Interview Tr. 2 at 37; *see* Stillwagon Interview Tr. 1 at 9, 12.) On why he pulled over, Stillwagon further related:

> And I couldn't understand. I kept staying behind him. All I wanted to do was go 42, over 23, over to go to Mt. Vernon. So I figure this guy's got—going to get off one of these roads. So when—he showed me his baseball bat. He's going like that. He's going to hit me with his baseball bat. I go—.
>
> So when I went around him he just smiled, he had a baseball bat. I said no

big deal. So I just kept going. So he sort of disappeared. And I see these lights and he's passing like five or six cars at a time. And he comes up right behind me. I mean, fucking this close. And I said this guy is going to fucking kill me. He's a fucking idiot.

So I go on—I speed up. And then he just sort of slows down. And then a car passes. I think a car passed him. And I went, you know, I went in to—let's see what I did. When he did that he got right behind me and then I sped up and then he just sort of backed off, you know. I said that really bothered me. Then I said I have this gun. I said I'm not going to go down in front of a Dodge pickup truck, you know. So that's why I pulled over. That's when I pulled over. (Stillwagon Interview Tr. 1 at 15–16.) Two other motorists pulled over too. (*Id.* at 9, 12.) They asked Stillwagon if he was alright, and the woman motorist asked whether someone should call the police. (*Id.* at 9, 16.) As he informed the officers, Stillwagon responded in the affirmative: "I said yeah, call the police. Will you call the police for me? Can you do that for me?" (*Id.* at 16; *see also* Stillwagon Interview Tr. 2 at 43.) The woman then asked Stillwagon what he was going to do. (Stillwagon Interview Tr. 1 at 16.) Stillwagon explained: "I said, I'm going to go up the road. After I figure he'll go up the road. And I might see the little bastard, I'll see what his problem is. So that's when I went on up the road." (*Id.* at 16–17.) Stillwagon further stated that, while stopped at the side of the road. "I jacked one [bullet] in when I pulled over at that gravel thing. When those people said, what are you going to do about it, I'm going to go up

depositions whether they watched the video that evening, (*see* Radabaugh Dep. Vol. 1 at 91–93, 98–100 [ECF No. 193–1]; Segaard Dep. Vol. I at 125 [ECF No. 160–1].), the

Court, in viewing the evidence in the light most favorable to Stillwagon, assumes that they watched the video before Stillwagon's arrest.

that road and see what's wrong with that bastard. I figured he was a farm kid, he had a big day and I was just going to go to Mt. Vernon, you know, to the cemetery." (*Id.* at 23.)

Stillwagon indicated that after pulling away from the motorists, he "thought [Mattingly] was long gone." (Stillwagon Interview Tr. 2 at 41.) But, then, "[a]ll of a sudden here comes this fucking pickup truck going about 80 miles an hour passing seven cars. He's right behind me again. And I don't know if he stayed at that Marathon station and hid because I didn't see him anymore, you know." (*Id.* at 17.) Stillwagon related how Mattingly then slowed down and started "jerking his brakes." (*Id.* at 18.) Stillwagon kept his distance, and Mattingly then drove through a red light, Stillwagon explained. (*See id.*)

Stillwagon stated that his next encounter with Mattingly was near the William Street exit ramp: "I looked on 23, he had like 10 or 20 cars backed up. He was going 10 miles an hour down the road." (Stillwagon Interview Tr. 1 at 18.) Mattingly was in the passing lane and then "[a]ll of a sudden he just went like this, over, and he went down there [the exit ramp], I was still back, way back here because I waited at that light. It was all the traffic. Then I get off that exit thinking this guy's clear. And there he is." (Stillwagon Interview Tr. 2 at 54; *see also* Stillwagon Interview Tr. 1 at 19 ("[A]ll of a sudden he just rips off and goes down that exit. So I go down that exit, you know, I said, that son of a bitch. I just want to know what his problem was.").) Stillwagon later clarified that the William Street exit is the one he uses when he drives from his office to his parents' grave, as he was doing that day. (*See* Stillwagon Interview Tr. 1 at 23–24, 26.)

As Stillwagon drove down the exit ramp, he saw that Mattingly was stopped ahead. (*See* Stillwagon Interview Tr. 2 at 39, 54

("I'm behind him, you know, may three or four, five minutes. So I go down that ramp and next thing is he's down at the end of the thing because the light got him, you know.").) Then, as Stillwagon related, "[w]hen I got down that ramp and I saw his lights go on I said, this son of a bitch is going to back up on me and now I'm going to eat this truck. I went bang, bang. You can see the pattern. I put a tight pattern right there. If I wanted to kill the fucker I would have shot him right in the fucking head." (Stillwagon Interview Tr. 1 at 21; *see also id.* at 19–20 ("[W]hen I shot—I shot like two times at him I think it was. And I just shot right down the middle. I wasn't trying to shoot the fucker. I was just going to say, you know, you have your fucking truck, you know, with you but we can talk.").) Stillwagon later reiterated: "When I saw his lights. I saw his lights go on. I said this son of a bitch is backing upon me and I'm going to make sure he understands that we're not going to do that today." (*Id.* at 24; *see also* Stillwagon Interview Tr. 2 at 33 ("I saw the lights and . . . I shot two shots into his car to say don't fuck with me. Okay. Just go your way.").)

After Stillwagon fired at the truck, Mattingly "ripped around the corner" and off the exit ramp. (Stillwagon Interview Tr. 2 at 39.) Stillwagon waited at the red light at the end of the ramp. (*Id.*) He explained to the officers that he did not expect to see Mattingly again: "He went and I figured the guy is done. We're done. He's not going to fuck around with me anymore." (Stillwagon Interview Tr. 1 at 31; *see also* Stillwagon Interview Tr. 2 at 39 ("I waited for the light and I said, you know, that fucker is gone.").) When the light changed, however, Stillwagon explained that he was surprised to see Mattingly "dead stopped waiting for me" in the middle of the road. (Stillwagon Interview Tr. 2 at 34.) As Stillwagon drove up the road, Mattingly

turned into the AutoZone parking lot in a maneuver that Stillwagon interpreted as the beginning of a u-turn: "I come around the thing and I go, holy fuck, this guy's in the—he's waiting for me again. After that he just goes around. I don't know if he went over a curb or there's a road there.... And I said this guy is coming back. He's going to come back on me and run me over." (*Id.*) To avoid what he thought would be another vehicular attack by Mattingly, Stillwagon explained that he "jumped into where you saw me where I ended up. I was just trying to gel behind that concrete pier to try to get some type of defense and I jumped up and I shot at his—shot at his car." (*Id.* at 34–35; *see also* Stillwagon Interview Tr. 1 at 21–22, 28, 30 ("Then I don't know, something came in his head to stop and then he did a big u-ey and he was going to come back on me. He figures he was probably going to try to run me over or something.") ("Then he just goes—he sees me and then he ... makes a big boomerang and I just did a short—I could see that concrete pier and I'm going to get behind it to protect myself.") ("And he stopped dead in the road and sees me and then he makes his big rush to get another. It's like an ambush. That's what it looked like to me. Like he's going to ram me with his truck now.").)

Stillwagon made it the pillar, he explained, by turning his bike "as fast as [he] could." (Stillwagon Interview Tr. 2 at 49.) Stillwagon then pulled out his gun and fired at the truck's tire. (*See id.* at 49, 51.) He explained: "I was flicking going crazy, too, because hurry up and coming for me. So I jumped off the bike and I turned around and I went bang, and then he—he came and I remember shooting his tire.... I said I'm going to stop this son of a bitch from going down the road anymore." (*Id.* at 51.) Mattingly then swung around the concrete pillar and aimed the truck at Stillwagon. (*See* Stillwagon Interview Tr. 1 at 19.) "I was fearing for my life," he told the officers. (Stillwagon Interview Tr. 2 at 40.) Stillwagon again fired at the truck; as he explained,

[Mattingly] goes fast and he goes like this, jams his brakes on and he floors it and he goes up around those cars. And I figure he's coming back to ram me .... He was coming right for me. I shot—I think I shot again right into his engine. I said, I'll fucking kill you. And he went like this. Let's see, he went in—I shot him—I shot at him right here he was coming right for me because my bike is—you guys know where the bike is. He was coming right for me in that fucking truck.

(Stillwagon Interview Tr. 1 at 19–20.) Stillwagon later reiterated: "Then I turned into that thing quick because I didn't want to be set up and that's as far as I got and I could hear that engine. I immediately got the kickstand, jumped off and I went like that, bam, shot into his truck a couple of times, maybe once. I don't know." (*Id.* at 22.)

After Stillwagon shot at the engine, the truck "swung off" and stopped. (*See* Stillwagon Interview Tr. 2 at 36.) Stillwagon told the officers that he then ran around the car:

I said what the fuck—and he came out real sheepish. And he's like this. I said he has a gun, it's going to be bad. I'm going to get shot or he's going to get shot. And he goes mother fuck, you—something. I couldn't even understand what the hell he was saying. And then I just said you're fucking crazy and I just kicked him right in the leg then just went—hit him in the head like that. And that was it.

(*Id.* at 51; *see also* Stillwagon Interview Tr. 1 at 20–22 ("[H]e came out of the car like this, he had his hand down like that and I had the gun. I said dude, I'm going to fucking let you have it. He had some-

thing hanging down. I don't know if he had some rope. So I went over and I kicked him like—I kicked him like what the fuck's wrong with you. Then I hit him right in the head with the gun.") ("And then he stopped and then that made him veer, off and stop at the 42. He couldn't get out because of the traffic. Then I went over and he got out like a sheep dog, you know. Like a punk. And I've been in enough—I go, what the fuck's wrong with you man? You want to get killed today or what? You try killing me. I'm not going to let you do that to me.").)

Stillwagon and Defendant Gerke discussed the last round that discharged from Stillwagon's pistol:

STILLWAGON: I kicked him and he went—then I hit him. And the mistake was I must have had my hand on—I was so pissed that it must have popped my—popped the gun off. I don't know if I shot him in the head or not.
GERKE: Yeah, you did.
STILLWAGON: Did I?
GERKE: Uh-huh.

(Stillwagon Interview Tr. 2 at 32.) Later, Stillwagon and Gerke again addressed the last gunshot:

GERKE: That's when the round went?
STILLWAGON: Yeah. Must have. I must have had my finger on the trigger.
GERKE: All right. So you didn't walk up to him and shoot him in the head?
STILLWAGON: No. I would have shot him in the head at the—when he was stopped at the light.
GERKE: I just want to make that clear.
STILLWAGON: Yeah. Yeah. No. No. he's just punking.

(Id. at 51–52; see also Stillwagon Interview Tr. 1 at 21 ("[W]hen I hit him in the head my finger must have been on the trigger. But I don't think—I don't know

what I did. I hit him with the handgun. I hit him over the head. I said, what the fuck, you trying to kill me?").)

### ii. Probable Cause

The Municipal Defendants contend that the officers had probable cause to arrest Stillwagon for felonious assault, which, in Ohio, is a crime committed when a person knowingly causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance. O.R.C. § 2903.11(A). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." *Id.* § 2901.22(B). The defendant officers purportedly had probable cause to arrest Stillwagon for this crime when (i) Stillwagon shot at Mattingly's truck and (ii) Stillwagon hit Mattingly on the head with his hand and pistol. (*See* Defs.' Mot. for Summ. J. at 2–7 [ECF No. 203].)

### (1) Shots Striking Mattingly's Truck

Viewing the evidence in the light most favorable to Stillwagon, a jury could reasonably conclude that the officers lacked probable cause to arrest Stillwagon for felonious assault based on the shots that struck Mattingly's truck. Specifically, the jury could find that the officers had insufficient information suggesting that Stillwagon *knowingly* attempted to cause Mattingly physical harm by means of a deadly weapon.[18]

In concluding that they had probable cause to arrest Stillwagon for felonious assault, the officers relied heavily on Stillwagon's interview statements. (*See* Segaard Dep. Vol. I at 141, 151 [ECF No. 160–1].) But in his interview with Segaard and Gerke, Stillwagon repeatedly stated

---

18. Stillwagon does not assert self-defense regarding the shots that struck Mattingly's

truck. (Pl.'s First Mot. for Summ. J. at 2 [ECF No. 205].)

that he was shooting at the truck, not Mattingly. (*See, e.g.*, Stillwagon Interview Tr. 1 at 19–21 [ECF No. 160–10]; Stillwagon Interview Tr. 2 at 34–35 [ECF No. 160–11].) And various pieces of information supported this exculpatory assertion. Stillwagon described, for example, numerous instances when he easily could have shot Mattingly. (*See, e.g.*, Stillwagon Interview Tr. 1 at 21; Stillwagon Interview Tr. 2 at 51–52.) Stillwagon, however, did not avail himself of any of those opportunities. Stillwagon described the efforts he took to distance himself from Mattingly and he described his attempt to shelter by the concrete pillar in the AutoZone parking lot; these efforts evidenced Stillwagon's reluctance to engage and, thus, that he did not knowingly attempt to harm Mattingly. (*See, e.g.*, Stillwagon Interview Tr. 1 at 9–21, 31; Stillwagon Interview Tr. 2 at 39.) And the bullet holes found in Mattingly's truck (whose locations corresponded with Stillwagon's interview statements on where he shot the truck) were situated in places far from where Mattingly was seated. (*See* Stillwagon Interview Tr. 2 at 44–45.)

In support of their argument that the officers had probable cause to arrest Stillwagon, the Municipal Defendants point to *State v. Weaver*, 2d Dist. Montgomery No. 26591, 2016-Ohio-7984, ¶¶ 3–5, 2016 WL 7077001, a case in which an Ohio appellate court affirmed a defendant's criminal conviction for felonious assault. In *Weaver*, police officers stopped the defendant after observing him shooting out of his car window at another vehicle. *Id.* ¶¶ 3–4. The defendant claimed to be acting in self-defense, and he insisted that he was only attempting to shoot the other vehicle's tires. *Id.* ¶ 5. Although *Weaver* and the present case share some similarities, the facts of the cases are distinct. The officers in *Weaver* observed the defendant firing his gun and presumably concluded that the defendant was not acting in self-defense or attempting to only shoot the other vehicle's tires. *See id.* ¶ 3. There is also no discussion in *Weaver* of any evidence, aside from the defendant's statement, that may have supported the assertion that the defendant was shooting at the other vehicle's tires. *See id.* ¶¶ 3–12. Here, by contrast, no officers observed Stillwagon fire his pistol; instead, the officers relied on Stillwagon's statement, which Segaard and Gerke found to be credible. (*See* Segaard Dep. Vol. I at 130 [ECF No. 160–1]; Stillwagon Interview Tr. 2 at 37.) And, unlike *Weaver*, Stillwagon's assertion that he was not attempting to shoot Mattingly was bolstered by independent evidence—the location of the bullet holes. (*See* Stillwagon Interview Tr. 2 at 44–45.) *Weaver*, in short, does not control here.

### (2) Hand and Pistol Strike to Mattingly's Head

A jury could also reasonably conclude that a reasonable police officer would have conclusively known that Stillwagon was acting in self-defense and that probable cause to arrest him for felonious assault was, therefore, lacking regarding the blow Stillwagon delivered to Mattingly's head using his hand and pistol. *See Painter*, 185 F.3d at 571 & n.21.[19]

19. The officers may have believed that Stillwagon shot Mattingly (rather than, or in addition to, hitting him). (*See* Gerke Dep. Vol. II at 262 [ECF No. 184–1]; Segaard Dep. Vol. I at 236–37 [ECF No. 160–1]; Willauer Dep. Vol. I at 98–99 [ECF No. 52–1]; Willauer Dep. Vol. II at 129–31 [ECF No. 157–1].) However, in considering the evidence in the light most favorable to Stillwagon, the Court assumes that a reasonable officer in the defendant officers' position would have credited Stillwagon's assertion that he simply hit Mattingly on the head. (*See* Stillwagon Interview Tr. 2 at 51 [ECF No. 160–11]; *see also* Defs.' Mot. for Summ. J. at 15–18 [ECF No. 203] (assuming for summary judgment purposes that Mattingly was hit, not shot).)

To establish a claim of self-defense under Ohio law, the accused must prove by a preponderance of the evidence that (1) he was not at fault in creating the violent situation, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, and (3) that he did not violate any duty to retreat or avoid the danger. *State v. Thomas*, 77 Ohio St.3d 323, 673 N.E.2d 1339, 1342 (1997); *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279, 1281 (1990). Self-defense also involves a proportionality requirement: the accused "is privileged to use that force which is reasonably necessary to repel the attack." *Williford*, 551 N.E.2d at 1281. Clarifying the second element of a self-defense claim, the Ohio Supreme Court has explained that courts analyzing an accused's fear of imminent harm must apply a combined subjective and objective test. *Thomas*, 673 N.E.2d at 1345. "The person's belief must be objectively reasonable under the circumstances, and he must subjectively believe he needed to resort to force to defend himself." *In re C.L.*, 197 Ohio App.3d 514, 2011-Ohio-6892, ¶ 23, 968 N.E.2d 34 (4th Dist.).

Based on Stillwagon's detailed explanation of the incident and the Eagle's Lodge security camera footage, a reasonable officer could have conclusively known that Stillwagon was not at fault in creating the confrontation with Mattingly. Stillwagon insisted that he took the actions he did because Mattingly had repeatedly tried to kill him. (*See, e.g.*, Stillwagon Interview Tr. 1 at 12, 21 [ECF No. 160–10].) Stillwagon informed the officers of Mattingly's numerous unprovoked attacks. (*See, e.g., id.* at 9–21.) He described several instances in which he attempted to distance himself from Mattingly. (*See, e.g., id.*) And he described his attempt to take shelter near a concrete pillar in the parking lot—a maneuver recorded on the Eagles Lodge video. (Eagles Video at 15:31:02 to 15:31:13; Stillwagon Interview Tr. 2 at 34–35 [ECF No. 160–11].) The bullet holes in Mattingly's truck could, moreover, reinforce the conclusion that Stillwagon was not at fault in creating the confrontation. Their locations could suggest that Stillwagon was firing defensively—that is, attempting to disable the truck or send a message, not injure the truck's driver.

A reasonable officer could have also conclusively known that Stillwagon had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. Stillwagon informed the officers that he was afraid for his life and that Mattingly had nearly killed him multiple times. (*See, e.g.*, Stillwagon Interview Tr. 1 at 9–21; Stillwagon Interview Tr. 2 at 40 [ECF No. 160–11].) The Eagles Lodge video supported those statements, as it revealed Mattingly leaving the parking lot and then re-entering the lot and driving directly at Stillwagon. (Eagles Video at 15:31:17 to 15:31:31.) The presence of a baseball bat in Mattingly's truck also bolsters the conclusion that Stillwagon's fear for his life was objectively reasonable. Wielding a baseball bat, Mattingly could have seriously injured or killed Stillwagon even after the truck was disabled.

Based on much of the same information, a reasonable officer could have conclusively known that Stillwagon, in striking Mattingly on the head with his pistol, used only the amount of force reasonably necessary to repel Mattingly's attacks. Stillwagon told the officers that Mattingly had just tried to kill him and that he feared for his life. (*See, e.g.*, Stillwagon Interview Tr. 1 at 9 21; Stillwagon Interview Tr. 2 at 40.) And the threat posed by Mattingly was evidenced by the baseball bat found in Mattingly's truck (and brandished by Mattingly earlier in the encounter) and by the

Eagles Lodge video, which, as noted above, recorded Mattingly re-enter the parking lot and drive directly at Stillwagon. (Eagles Video at 15:31:23 to 15:31:31.)

As to the final element, the parties dispute whether Stillwagon had a duty to retreat. The duty hinges on whether Stillwagon used "deadly force" in striking Mattingly on the head with his hand and pistol. *See Williford*, 551 N.E.2d at 1282; *State v. Kucharski*, 2d Dist. Montgomery No. 20815, 2005-Ohio-6541, ¶ 19, 2005 WL 3358860. Under Ohio law, deadly force "means any force that carries a substantial risk that it will proximately result in the death of any person." O.R.C. § 2901.01(A)(2). A substantial risk "means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur." *Id.* § 2901.01(A)(8).

A reasonable officer could have conclusively known that Stillwagon's act of striking Mattingly on the head with his hand and pistol was not a utilization of deadly force. Stillwagon struck Mattingly on the head once. (Stillwagon Interview Tr. 2 at 51.) And the wound Mattingly suffered was minor. (*See* Segaard Investigation Report at PageID 4574 [ECF No. 160-4] (regarding Mattingly's condition. Segaard "was advised that he had been talking and it was believed that he would recover"); Willauer Dep. Vol. I at 98–99 [ECF No. 52–1] (acknowledging that Mattingly was reported to have only suffered a graze on his head); Willauer Dep. Vol. II at 129 [157–1] (stating that Mattingly was reported to be alert at the scene).)

However, even if Stillwagon used deadly force, a reasonable officer could have conclusively known that Stillwagon did not violate a duty to retreat. First, a reasonable officer could conclude that Stillwagon did not violate a duty to retreat when he entered the AutoZone parking lot and stopped by the concrete pillar. Stillwagon informed Segaard and Gerke of his efforts to distance himself from Mattingly on Route 42 and the William Street exit ramp. (*See, e.g.*, Stillwagon Interview Tr. 1 at 9–21; Stillwagon Interview Tr. 2 at 39.) And, most pertinently, Stillwagon informed the officers that he drove to the pillar to use it as a shield against Mattingly's truck. (*See, e.g.*, Stillwagon Interview Tr. 1 at 20–22, 25–26, 28; Stillwagon Interview Tr. 2 at 34, 49, 51.) Stillwagon's fear that Mattingly might use the truck to attack him again is vindicated by the Eagles Lodge video, which shows Mattingly enter the parking lot seconds before Stillwagon and promptly begin looping the truck around the pillar in way that could suggest Mattingly intended to continue pursuing Stillwagon. (*See* Eagles Video at 15:30:58 to 15:31:04.) And the video also vindicates Stillwagon's fear when it shows Mattingly re-enter the parking lot and drive directly at Stillwagon. (*Id.* 15:31:23 to 15:31:31.)

██ And second, a reasonable officer could also conclude that Stillwagon did not violate a duty to retreat when he approached Mattingly. Stillwagon told the officers that the truck stopped in front of him when Mattingly veered off from his charge. (*See* Stillwagon Interview Tr. 2 at 36.) Mattingly exited the truck with a hand down. (Stillwagon Interview Tr. 1 at 20.) Stillwagon's fear that Mattingly might have a gun, (*see* Stillwagon Interview Tr. 2 at 51), could justify his swift approach toward Mattingly. Ohio law only requires a person to retreat "if he has available a *reasonable* means of retreat from the confrontation." *Williford*, 551 N.E.2d at 1282 (emphasis added). And retreating from a person who had engaged in the conduct Mattingly had, and who might also have a gun, might not be reasonable.

When the evidence is viewed most favorably to Stillwagon, a jury could, in sum, reasonably conclude that the officers lacked probable cause to arrest Stillwagon

for felonious assault. And consequently, the evidence produced by Stillwagon, when viewed in the light most favorable to him, shows that he was falsely arrested. The Court now moves to the second portion of the qualified immunity inquiry—whether the alleged unconstitutional actions violated a clearly established right.

### b. Clearly Established Right

A right is clearly established for qualified immunity purposes if "the contours of the right at issue have been made sufficiently clear to give a reasonable official fair warning that the conduct at issue was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). "[W]hile a right may not be 'clearly established' at a 'high level of generality' or by broad historical assertions, neither must the specific conduct at issue have been found unconstitutional for a reasonable officer to be on notice that the conduct is unconstitutional." *Id.* at 615–16. That is, fair warning does not require " 'a [prior] case directly on point' " or even a prior case that is " 'fundamentally' " or " 'materially' " similar to the present case, as such a rule "would be too rigid an application of the clearly established inquiry." *Id.* at 613 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

Here, the contours of the right allegedly violated by the officers—freedom from arrest in the absence of probable cause—were sufficiently clear on the date in question to give a reasonable official fair warning that Stillwagon's arrest was unconstitutional if made without probable cause. *See Parsons v. City of Pontiac*, 533 F.3d 492, 504 (6th Cir. 2008); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016) ("The constitutional right to 'freedom from arrest in the absence of probable cause' is clearly established within our circuit." (quoting *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015))). Accordingly, a jury could reasonably conclude that the officers' actions violated a clearly established right.

### c. Objective Unreasonableness

In a final argument, the Municipal Defendants contend that even if the Court finds that the officers "should have conclusively determined that [Stillwagon] had acted in self-defense, [the officers'] error in any such determination would he in a gray area, not a clear transgression," (Defs.' Mot. for Summ. J. at 18.) The Municipal Defendants appear to argue, in other words, that the officers' actions were not objectively unreasonable in light of the clearly established right to be free of false arrest. *See Parsons*, 533 F.3d at 500 (explaining that the Sixth Circuit, in its qualified immunity analysis, occasionally considers " 'whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights' " (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005))). This argument fails. For the same reasons that a jury could find that a reasonable officer would have conclusively known that Stillwagon acted in self-defense, a jury could also find that the officers' decision to arrest Stillwagon was objectively unreasonable. *See id.* at 504.

Qualified immunity does not entitle Segaard, Willauer, Gerke, and Radabaugh to summary judgment on Stillwagon's false arrest claim.

### 2. Stillwagon's Motion for Summary Judgment

Although Stillwagon alleges that he was falsely arrested by Segaard, Willauer, Gerke, and Radabaugh, Stillwagon only moves for summary judgment against Se-

gaard and Willauer. (Pl.' s First Mot. for Summ. J. at 1 [ECF No. 205],) Stillwagon contends that the evidence supporting his false arrest claim is so one-sided that no jury could reasonably find in favor of the Municipal Defendants. (*See id.* at 75–76.) The Court disagrees.

A jury could reasonably conclude that the officers had probable cause to believe that Stillwagon knowingly attempted to cause physical harm to another by means of a deadly weapon (i.e., committed felonious assault) when he fired the rounds that struck Mattingly's truck. During his interview at the police station, Stillwagon told the officers several times that he was not trying to shoot Mattingly. At several points in the interview, however, Stillwagon made ambiguous statements, which, when viewed in the light most favorable to the Municipal Defendants, could suggest that Stillwagon was attempting to shoot Mattingly, not the truck. Stillwagon stated, for example: "He was coming right for me. I shot—I think I shot again right into his engine. I said, I'll fucking kill you. And he went like this. Let's see, he went in—I shot him—I shot at him right here he was coming right for me because my bike is— you guys know where the bike is. He was coming right for me in that fucking truck." (Stillwagon Interview Tr. 1 at 20 [ECF No. 160–10].) As Stillwagon also informed the officers: "I jacked one [bullet] in when I pulled over at that gravel thing. When those people said, what are you going to do about it. I'm going to go up that road and see what's wrong with that bastard. I figured he was a farm kid, he had a big day and I was just going to go to Mt. Vernon, you know, to the cemetery." (*Id.* at 23.)

A jury could also reasonably determine that the officers had probable cause to arrest Stillwagon for the blow he delivered to Mattingly's head because a reasonable police officer might not have conclusively known that Stillwagon hit Mattingly on the head in self-defense.

Stillwagon informed the officers during his interview, for example, that he approached Mattingly after the truck came to a stop in the AutoZone parking lot. (*See* Stillwagon Interview Tr. 1 at 20–22 [ECF No. 160–10].) A jury could find that this admission undercuts the first element in Stillwagon's self-defense claim—that Stillwagon was not at fault in creating the violent situation.

Stillwagon informed the officers that Mattingly had waved a bat during the events on the highway and that Mattingly might have had something in his hand when he exited the truck. (*See* Stillwagon Interview Tr. 1 at 20, 29.) Given, however, that Stillwagon had not seen Mattingly with a gun (or some other projectile weapon), a jury could find that Stillwagon had not satisfied the second element in his self-defense claim—that he have an objectively reasonable belief that he was in imminent danger of death or great bodily harm.

Viewed in the light most favorable to the Municipal Defendants, the evidence could also show that a reasonable officer would have made the self-defense determination based on the assumption that Stillwagon shot Mattingly (rather than, or in addition to, striking Mattingly with his hand and pistol). A jury could arrive at this conclusion based on (i) paramedic statements overheard by some of the officers indicating that Mattingly had been grazed and (ii) Stillwagon's acknowledgment in his interview that he did not know if he shot Mattingly in the head. (*See* Segaard Dep. Vol. I at 236–37 [ECF No. 160–1]; Stillwagon Interview Tr. 2 at 32 [ECF No. 160–11]; Willauer Dep. Vol. II at 129–31 [ECF No. 157–1].)

Assuming Stillwagon shot Mattingly, Stillwagon would have had a duty to retreat. *See* O.R.C. § 2903.11(A); *State v.*

*Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 15, 2013 WL 2406261. And based on Stillwagon's admission that he approached Mattingly in the parking lot after the truck came to a stop, a jury could find that a reasonable police officer would not have conclusively known that Stillwagon fulfilled his duty to retreat.

For these reasons, the Court denies Stillwagon's request for summary judgment against Segaard and Willauer on the false arrest claim.

## C. Malicious Prosecution under § 1983

 Stillwagon and the Municipal Defendants have filed cross-motions for summary judgment on Stillwagon's § 1983 malicious prosecution claim. To prevail on that claim, a plaintiff must prove that "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Webb*, 789 F.3d at .659 (citing *Sykes*, 625 F.3d at 308–09).

### 1. The Municipal Defendants' Motion for Summary Judgment

The Municipal Defendants request summary judgment on Stillwagon's § 1983 malicious prosecution claim because (i) Defendants Segaard and Gerke are entitled to absolute immunity and (ii) each of the defendant officers is entitled to qualified immunity. (*See* Defs.' Mot. for Summ. J. at 11–13, 18–19 [ECF No. 203].)

### a. Absolute Immunity

Defendants Segaard and Gerke have raised the affirmative defense of absolute immunity in relation to their grand jury testimony against Stillwagon. They insist that their absolute immunity entitles them to summary judgment on Stillwagon's malicious prosecution claim.

#### i. Legal Background

 As a general rule, when a plaintiff is arrested pursuant to a grand jury indictment, " 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause.' " *Webb*, 789 F.3d at 660 (quoting *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006)); *see Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307 n. 13 (6th Cir. 2005). Under Sixth Circuit precedent, a plaintiff could overcome this conclusive determination if he could establish that the "defendants knowingly or recklessly present[ed] false testimony to the grand jury to obtain the indictment." *Webb*, 789 F.3d at 660 (citing *Martin v. Maurer*, 581 Fed.Appx. 509, 511 (6th Cir. 2014)).

 This exception largely disappeared in 2012 when the United States Supreme Court held that a grand jury witness has absolute immunity from any § 1983 claim based on the witness's testimony. *Rehberg v. Paulk*, 566 U.S. 356, 369, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012).[20] The immunity, the Court explained, could "not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness'[s] testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it oth-

---

20. Because absolute immunity is an affirmative defense that a defendant can waive, the exception for knowing or reckless grand jury testimony did not disappear entirely in 2012. *See Sanders v. Jones*, 845 F.3d 721, 733–34 (6th Cir. 2017). The Sixth Circuit continued applying the exception to malicious prosecution claims when the defendant did not raise absolute immunity as a defense. *See id.*

erwise, 'a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves.'" *Id.* (quoting *Dykes v. Hosemann,* 776 F.2d 942, 946 (11th Cir. 1985)). The Court clarified though that absolute immunity does not extend to all activity that a witness conducts outside of the grand jury room. *Id.* at 370, n. 1, 132 S.Ct. 1497. A law enforcement official might be entitled to only qualified immunity if, for example, she "falsifies affidavits ... [or] fabricate[s] evidence concerning an unsolved crime." *Id.*

The Sixth Circuit recently discussed *Rehberg* and the scope of absolute testimonial immunity in *Sanders v. Jones,* 845 F.3d 721, 727–35 (6th Cir. 2017), and *King v. Harwood,* 852 F.3d 568, 584–91 (6th Cir. 2017). The plaintiff in each case brought a malicious prosecution claim. And in each case, the defendant raised an absolute immunity defense. The cases are instructive because they illustrate "the thin but conspicuous line" between, on the one hand, a law enforcement officer who merely provides grand jury testimony, engages in related "'preparatory activity, such as a preliminary discussion in which [he] relates the substance of his intended testimony,'" or conspires with prosecutors or other officers to testify falsely and, on the other hand, a law enforcement officer who either (1) "'set[s]' the wheels of government in motion by instigating a legal action'" or (2) "'falsif[ies] affidavits'" or "'fabricate[s] evidence concerning an unsolved crime.'" *King,* 852 F.3d at 584 (quoting *Rehberg,* 566 U.S. at 370–71 & n. 1, 132 S.Ct. 1497). *Sanders* and *King* fell on different sides of the line.

 In its analysis of *Rehberg,* the Sixth Circuit reaffirmed that the Supreme Court left the door open for at least some § 1983 claims against grand jury witnesses. *Sanders,* 845 F.3d at 734. The door is not open wide though. Only in a limited set of circumstances may a plaintiff bring a § 1983 claim against a grand jury witness who has asserted absolute immunity. *See King,* 852 F.3d at 587–88. "[T]he presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not-conclusive" where

(1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*Id.*

Segaard testified before the grand jury and is therefore entitled to absolute immunity. (Segaard Dep. Vol. IV at 911 [ECF No. 199–1].) Gerke, on the other hand, has admitted that he did not testify before the grand jury. (Gerke Dep. Vol. II at 383 [ECF No. 184–1] ("I never testified at trial or at Grand Jury, no.").) Given this admission, Gerke is only protected by absolute immunity to the extent that he might have conspired with Segaard regarding Segaard's testimony. *See Rehberg,* 566 U.S. at 369, 132 S.Ct. 1497. To determine whether Segaard and Gerke are entitled to summary judgment based on this absolute immunity, the Court must consider whether Stillwagon has produced evidence that would allow him to rebut the presumption of probable cause created by the grand jury indictment. *See King,* 852 F.3d at 587–88.

#### ii. Alleged Omissions, False Statements, and Fabricated Evidence

Stillwagon opposes summary judgment by arguing that his § 1983 claims are not based on grand jury testimony. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 1–2, 15–16 [ECF No. 220].) According to Stillwagon, Segaard and Gerke knowingly or recklessly made false statements and falsified or fabricated evidence in the course of setting his prosecution in motion. (*See* Pl.'s First Mot. for Summ. J. at 38–75 [ECF No. 205].) And he argues that this evidence was material to the prosecution and does not consist solely of grand jury testimony or preparation for that testimony. (*See id.* Pl.'s Opp'n to Mot. for Summ. J. at 15–16.)

Stillwagon begins by identifying witnesses that Segaard allegedly concealed or attempted to influence with his own purportedly false comments.

- Tina Bickham witnessed Mattingly driving north in Route 42's southbound lane; she was driving one of the vehicles forced off the road to avoid a collision with Mattingly's truck. (*See* Bickham Call at 3–5 [ECF No. 162–3].) She spoke with Segaard the day after the incident and explained what she saw. (*See id.* at 2.) Segaard did not mention Bickham's call in his October 5, 2012 Investigation Report or in the Grand Jury Packet prepared that same day. (Segaard Dep. Vol. II at 422–23 [ECF No. 162–1].) Nor did Segaard otherwise inform the prosecutors about Bickham's call. (*See id.* at 422–25.)

- Kevin Cogan was also forced off the road when Mattingly used Route 42's southbound lane to pass a line of vehicles. (*See* Cogan Call at 4–8 [ECF No. 162–10].) Cogan spoke to Segaard about what he observed. (*See id.*) Stillwagon suggests that Se-gaard, in his phone conversation with Cogan, attempted to influence Cogan with false information, namely, that "there was definitely some kind of long road rage thing that had gone all the way from 33 all the way to Delaware from 42" and that "they did this for ten miles." (*Id.* at 9.)

- Ruth Sayre witnessed Mattingly chase and cut-in on Stillwagon on Route 42. (*See* Sayre Call at 4–5 [ECF No. 205–5].) She called Se-gaard to inform him that Mattingly's story of having mechanical problems with his truck was likely untrue. (*See id.* at 5, 11.) Stillwagon contends that Segaard hid Sayre's observations, as she was not mentioned in his Investigation Report or the Grand Jury Packet, and her name was not listed in the prosecution's discovery response to Stillwagon. (*See* Gov't Disc. Resp. at 1–2 [ECF No. 199–9]; Segaard Investigation Report at PageID 4573–91 [ECF No. 160–4], *See generally* Grand Jury Packet [ECF No. 160–4].) Stillwagon also suggests that Segaard may have attempted to influence Sayre with false information when he told her: "[I]t's getting more and more clear that the victim wasn't blameless as far as just the way this altercation began. But we do have to—ultimately the other guy did end up shooting him so he ... he did take it too far." (Sayre Call at 6.)

- And then there is Daniel Powell, who observed the events in the AutoZone parking lot and gave a statement to the police at the scene. (*See* Cruiser 66 Video at 15:40:53 to 15:41:12; Powell Dep. at 10, 22–23 [ECF No. 181–1].) In his statement at the scene, Powell described Mattingly leaving and re-entering the parking lot, and he described Stillwagon approaching and then hitting Mattingly

on the head with a gun, at which point the gun fired. (Cruiser 66 Video at 15:40:53 to 15:41:12.) Powell has since testified in a deposition taken for this case that he thought Mattingly "was going to try and run over Mr. Stillwagon." (Powell Dep. at 31.) He has also testified that it "[l]ooked like [Stillwagon] was just trying to disable the vehicle." (*Id.* at 29.) And as to the final shot fired. Powell has testified that Stillwagon "pistol whipped" Mattingly: "[Stillwagon] brought [the pistol] up kind of at an angle, and the barrel and everything was facing straight up, because I could see the muzzle flash go up." (*Id.* at 22.) Segaard did not mention Powell, or Powell's statement, in his Investigation Report. (*See* Segaard Investigation Report at PageID 4573–91.)

Stillwagon next identifies a 911 call that Segaard purportedly hid. When Stillwagon pulled off Route 42 near the intersection of Watkins/Moore Road, two motorists pulled off as well. (Stillwagon Interview Tr. 1 at 9, 12 [ECF No. 160–10].) Stillwagon had informed Segaard during his interview at the police station that he had asked the motorists to call 911. (*Id.* at 16.) Segaard told the prosecutors that he checked the Delaware communications center for the call but did not find anything. (Jan. 30, 2017 Dumolt Email at 1 [ECF No. 199–7].) Stillwagon notes, however, that he found the purportedly nonexistent call, (*see* Incident Run Sheet at 1 [ECF No. 160–12]), during his review of the communication center's records. (Pl.'s First Mot. for Summ. J. at 44–45.)

Stillwagon identifies alleged false statements in an email Segaard sent to the Delaware County prosecutors two days after the incident. In the email, Segaard outlined the evidence in the case, some of which supported the government's theory

that Stillwagon acted as the aggressor and shot Mattingly, and some of which contradicted the theory. (*See* Oct. 2, 2012 Segaard Email at 1–2 [ECF No. 199–10].) Regarding the Eagles Lodge video, Segaard stated:

> Really good thing—the shooting of Mattingly himself is actually caught on video. The downside is that the camera is very far away. But you can still see it. I am pretty sure that BCI can probably make it a lot better. I put a magnifying glass on my screen and I could see Stillwagon take a shooting stance at least three times. Twice he fired into the passenger window of the truck. Once from the rear bumper after Mattingly had exited the truck.

(*Id.* at 2.) But as Stillwagon explains, the Eagles Lodge video does not show Stillwagon taking a shooting stance near the truck's rear bumper. (*See* Pl.'s First Mot. for Summ. J. at 57–60; Eagles Video at 15:31:31 to 15:31:43.) And Segaard, despite viewing the video multiple times and at various magnifications during his deposition, admitted that he is unable to identify the moment in the video where Stillwagon allegedly stops and takes a shooting stance near the rear bumper. (*See* Segaard Dep. Vol. IV at 884–91 [ECF No. 199–1].)

Stillwagon identifies numerous purported falsehoods and alleged misleading omissions in Segaard's Investigation Report.

• Segaard, as noted above, omitted any reference to Bickham or Sayre in the Investigation report. (*See* Segaard Investigation Report at PageID 4573–91.)

• Segaard offered a purportedly false description of the Eagles Lodge video: he describes the video as showing Stillwagon "take[ ] a shooting stance, partially behind the taillight," (Segaard Investigation Report at PageID 4588), even though Segaard was unable to identify during his deposition the point in the

video where Stillwagon allegedly stopped and took the shooting stance. (*See* Segaard Dep. Vol. IV at 884–91.)

• Segaard asserted that Stillwagon "fired and struck Mattingly in the head" while Stillwagon was "partially behind the taillight," (Segaard Investigation Report at PageID 4588), despite various pieces of evidence showing that Mattingly was not shot, including the nature of the wound, the absence of any shell casings near the truck, Stillwagon's insistence that he physically hit Mattingly, the presence of an empty shell casing in Stillwagon's pistol, and the presence of a reddish residue on the pistol's rear sight. (*See* Pl.'s First Mot. for Summ. J. at 57–61.)

• Segaard omitted Mattingly's admission that his backup lights might have come on after he stopped his truck on the exit ramp. (*See* Segaard Dep. Vol. II at 515 [ECF No. 162–1]; Segaard Investigation Report at PageID 4573–91.)

• And Segaard wrote: "I was also informed that Stillwagon had already confessed to shooting Mattingly, to Officer Ailes." (Segaard Investigation Report at PageID 4574.) Ailes, however, has subsequently acknowledged that Stillwagon was *not* suggesting in his parking lot statements that he had shot Mattingly. (*See* Ailes Dep. Vol. II at 270 [ECF No. 156–1]; *see also* Ailes Cruiser Audio Tr. at 4 [ECF No. 156–3].)

Segaard also allegedly mischaracterized in the Investigation Report various statements Stillwagon made during his interview at the police station.

• Segaard wrote that Stillwagon "described a series of times where he and Mattingly had passed each other, in an aggressive way," (Segaard Investigation Report at PageID 4578), although Segaard now acknowledges that "[n]one of the witnesses that came forward described anything other than the aggressive truck." (Segaard Dep. Vol. III at 691 [ECF No. 164–1].)

• Segaard allegedly failed to mention Mattingly's re-entry to the roadway at Section Line Road (the "ambush," as Stillwagon refers to it). (*See* Segaard Investigation Report at PageID 4576.) Instead, Segaard wrote, "[Stillwagon] continued his story and picked it up at a point where the truck had been behind him again. His description became somewhat jumbled and then he recounted locating Mattingly at the red light where US 42 merges with US 23." (*Id.*)

• Segaard suggested that Stillwagon "[caught] up with Mattingly on the exit ramp, intentionally." (Segaard Investigation Report at PageID 4589.) Segaard purportedly ignores, however, that Mattingly made a sharp turn from the passing lane onto the exit ramp after Stillwagon had already entered the exit lane. (Pl.'s First Mot. for Summ. J. at 50–51; *see* Segaard Investigation Report at PageID 4589.)

• Segaard averred that Stillwagon had fired the shots on the exit ramp from 20 to 30 feet behind Mattingly's truck, (*see* Segaard Investigation Report at PageID 4589), despite the fact that the shell casings had been found 140 to 160 feet from the end of the ramp. (*See* Exit Ramp Diagram at 1 [ECF No. 160–13]; Exit Ramp Photo at 1 [ECF No. 199–5].)

• And Segaard wrote that Stillwagon admitted to "follow[ing]" Mattingly into the AutoZone parking lot. (Segaard Investigation Report at PageID 4576.) Segaard purportedly fails to mention though that Stillwagon had waited at the light at the end of the exit ramp, that Mattingly had stopped on William Street, and that Stillwagon drove directly to the concrete pillar rather than follow the path taken by Mattingly in the

parking lot. (Pl.'s First Mot. for Summ. J. at 54–55; see Segaard Investigation Report at PageID 4576.)

Stillwagon notes that a reddish residue on the rear sights of his pistol was present in a photograph taken of the pistol at the crime scene but was never mentioned in Segaard's paperwork in the criminal case. (Pl.'s First Mot. for Summ. J. at 61–62.)

Stillwagon identifies a purported false statement on the cover page of the Grand Jury Packet—that the case involved "a more than 10 mile, *mutual* 'road rage' incident" in which "James Stillwagon discharged a firearm at Richard Mattingly's vehicle, before ultimately shooting him in the head." (Grand Jury Packet at PageID 4559 [ECF No. 160–4] (emphasis added).) Segaard later admitted in his deposition that he should not have used the word "mutual." (Segaard Dep. Vol. III at 673.)

Stillwagon identifies two alleged misrepresentations in the Grand Jury Synopsis PowerPoint. First, in slides purporting to illustrate the exit ramp incident, Segaard placed Stillwagon's motorcycle north of the second turn arrow painted on the ramp. (Grand Jury Synopsis at 23–26 [ECF No. 165–1].) As Segaard later admitted, Stillwagon's true location was south of the second turn arrow and, thus, farther from the truck than Segaard had indicated. (*See* Segaard Dep. Vol. IV at 873.) Second, a slide describing Stillwagon's purported statements to Officer Ailes states: "Truck was 'dead stopped' on US 23 off-ramp." (Grand Jury Synopsis at 57.) The cruiser camera video, however, records Stillwagon saying "I was a dead stop." (Ailes Cruiser Audio Tr. at 4 (emphasis added).)

Stillwagon points to Segaard and Gerke's purported effort to manipulate Mattingly into fabricating his story of the incident. (*See* Pl.'s First Mot. for Summ. J. at 66–69.) After listening to Mattingly's initial, unconvincing, description of the incident, the officers allegedly pressured Mattingly to fabricate (i) his being shot in the head from a distance and (ii) an explanation for why he re-entered the AutoZone parking lot that would fit with the narrative of him being the frightened victim. (*See id.*; see also, e.g., Mattingly Interview Tr. 1 at 39, 64 [ECF No. 155–5] (Segaard: "Yeah. Blows my mind. I don't know why you [re-entered the parking lot] and I'm trying to—I was hoping you could help me understand.") (Segaard: "[I]f you're talking to the news, what you should focus on is how sore you are. how much it hurt getting shot."); Mattingly Interview Tr. 2 at 13, 16–17, 41, 43, 79 [ECF Nos. 184–3, 184–4] (Gerke: "Let's not forget the fact that your truck is shot to hell and you were shot in the head. Do you understand that?") (Gerke: "Start at the gas station and carry us to AutoZone when you got shot in the fucking head.") (Gerke: "Dude, you got shot in the head. Your truck is shot to shit. I mean, let's not overlook that. You re the victim here,") (Segaard: "[T]he defense team is going to say, my client says that he hit you with the gun, he didn't shoot you. He was just mad and he punched you. Minor assault. You're going to say, no, he shot me.") (Gerke: "Could the behavior of your driving ... be you pulled into the parking lot, you didn't see him, and you did another loop and said maybe I shouldn't be going back just in case he's still there?").)

Lastly, Stillwagon argues that Segaard presented the prosecutors with witness statements that Segaard knew to be false. (*See* Pl.'s First Mot. for Summ. J. at 69–75.) Chris Linkous, William Brown, and Susan Orcena all gave statements on what they purportedly saw in the AutoZone parking lot. (*See id.*) The statements, however, were each contradicted in critical ways by the Eagles Lodge video, which Segaard had viewed. (*See id.*) And, in his Investigation Report, Segaard purportedly misrepresented the content of those wit-

ness statements to make them seem consistent with one another and the other evidence in the case. (Pl.'s First Mot. for Summ. J. at 69–75; see Segaard Investigation Report at PageID 4583–91.)

### iii. Analysis

The Municipal Defendants contend that even if Segaard and Gerke omitted information, made false statements, or fabricated evidence, their conduct falls within the scope of Segaard's absolute immunity. (See Defs.' Opp'n to Pl.'s First Mot. for Summ. J. at 18 n.4 [ECF No. 216]; Defs.' Reply in Supp. of Mot. for Summ. J. at 7–10, 16 [ECF No. 233].) In support of this argument, the Municipal Defendants point to the Sixth Circuit's decision in *Sanders v. Jones.*

In *Sanders*, several pieces of evidence known to the defendant, Lamar Jones, suggested that Amy Sanders was not the drug dealer identified by a confidential informant. See *Sanders*, 845 F.3d at 723–25. Nonetheless, Jones prepared, and forwarded to the prosecutor's office, a police report that, according to Sanders, falsely identified her as a drug dealer. See *id.* at 723–25, 730. Jones did not discuss the report with anyone from the prosecutor's office until the morning of the grand jury. *Id.* at 724–25. Reading directly from the police report for most of his grand jury testimony, Jones testified that Sanders was the drug dealer. See *id.* at 725. Sanders was indicted. *Id.* The charges against her were eventually dismissed though due to misidentification. *Id.*

█ The Sixth Circuit held that Jones was entitled to summary judgment on Sanders's malicious prosecution claim. *Sanders*, 845 F.3d at 735. As the court explained, although *Rehberg* did not provide Jones absolute immunity for his police report, the police report standing alone could not rebut the grand jury's finding of probable cause. *Id.* at 733. That is because "false statements in a police report or

made to a prosecutor cannot, on their own, be material to the *grand jury's* finding of probable cause." *Id.* at 732. *Rehberg*, in other words, "effectively defeat[ed] Sanders's malicious prosecution claim based on the alleged false police report because she [could not] overcome the presumption of probable cause without using Jones's absolutely immune grand jury testimony." *Id.* at 733.

The circumstances in *Sanders* bear some similarities to those present here. Most notably, both Sanders and Stillwagon have argued that an officer's investigation report contained false information. Stillwagon's malicious prosecution claim against Segaard and Gerke is, however, not controlled by the outcome in *Sanders*.

Less than three months after issuing *Sanders*, the Sixth Circuit explained in *King v. Harwood* that the presumption of probable cause created by a grand jury indictment is rebuttable, and not conclusive, in a limited set of circumstances (listed earlier). See *King*, 852 F.3d at 587–88. The evidence produced by Stillwagon fits within this limited set of circumstances.

█ Stillwagon has created a genuine issue of material fact on whether Segaard and Gerke, in the course of setting Stillwagon's prosecution in motion, either knowingly or recklessly made false statements or falsified or fabricated evidence. See *King*, 852 F.3d at 591. When viewed in the light most favorable to Stillwagon, the evidence, shows that Segaard and Gerke initiated Stillwagon's prosecution. Segaard directed Willauer to prepare and file felonious assault charges, and Gerke may have participated in the decision to charge Stillwagon. The evidence, viewed most favorably, also shows that Segaard knowingly or recklessly made false statements in his Investigation Report, in an email communication with prosecutors, in the Grand Jury Packet, and in the Grand Jury Syn-

opsis PowerPoint. And the evidence, viewed most favorably, shows that Segaard and Gerke knowingly or recklessly falsified or fabricated evidence when they purportedly attempted to manipulate Mattingly's testimony and when Segaard conversed with witnesses on the phone.

The evidence produced by Stillwagon also creates a question for the jury on whether this alleged false and fabricated evidence, together with the purported misleading omissions in Segaard's Investigation Report and other investigative materials, were material to Stillwagon's prosecution. *See King*, 852 F.3d at 591. The Municipal Defendants contend that the purported omissions and alleged false and fabricated evidence were not material to the prosecution because Stillwagon's own admissions created probable cause for his arrest and prosecution. As the Court explained in its discussion of the false arrest claim though, a jury could reasonably conclude that the officers lacked probable cause to arrest Stillwagon. And as the Court explains below, a jury could also reasonably conclude that there was no probable cause for Stillwagon's prosecution. When viewed in the light most favorable to Stillwagon, the purported omissions and alleged false and fabricated evidence were material to the prosecution, as they (i) manufactured support for the theory that Stillwagon shot Mattingly in the head from a distance; (ii) inaccurately suggested that Stillwagon was attempting to shoot Mattingly rather than the truck; and (iii) undercut Stillwagon's assertion of self-defense.

And a question for the jury exists on whether the purported omissions and alleged false and fabricated evidence consist solely of grand jury testimony or preparation for that testimony. *See King*, 852 F.3d at 591. Most of the alleged false statements come from Segaard's Investigation Report; several statements come from the Grand Jury Packet and the Grand Jury Synopsis PowerPoint; and one statement comes from an email Segaard sent to the Delaware County prosecutors. The Municipal Defendants contend that each of these documents was made in preparation for Segaard's grand jury testimony. The Court concludes, however, that these documents, prepared nearly four months before Segaard testified before the grand jury, could reasonably be viewed as Segaard's effort to " 'lay[ ] the groundwork for an indictment,' " *id.* (quoting *Sankar v. City of New York*, No. 07 CV 4726, 2012 WL 2923236, at *3 (E.D.N.Y. July 18, 2012)), and not as the sort of preparatory activity (such as a preliminary discussion in which the witness relates the substance of his intended testimony) discussed in *Rehberg*.

Further, although the Municipal Defendants focus on the alleged false statements contained in the Investigation Report, Grand Jury Packet, and Grand Jury Synopsis PowerPoint, Stillwagon has also pointed to (i) Segaard and Gerke's purported attempt to manipulate Mattingly's testimony, (ii) Segaard's alleged effort to influence Cogan and Sayre, and (iii) two pieces of evidence (i.e., the 911 call from Watkins/Moore Road and the reddish residue on the rear sights of Stillwagon's pistol) omitted from the entirety of Segaard's case file. These assertions of evidence fabrication and omission are unlikely to constitute preparatory activity for Segaard's grand jury testimony.

For these reasons, Segaard and Gerke are not entitled to summary judgment on the basis of absolute immunity.

### b. Qualified Immunity

The Municipal Defendants next contend that Segaard, Gerke, Willauer, and Radabaugh's qualified immunity entitles them to summary judgment on Stillwagon's § 1983 malicious prosecution claim. The Court disagrees.

### i. Constitutional Violation

██ The Municipal Defendants argue that Stillwagon cannot show the existence of a constitutional violation because the officers had probable cause to prosecute him. To determine the existence of probable cause, the Court looks to the information known by the officers when they brought or participated in bringing charges against Stillwagon. *See Sykes*, 625 F.3d at 310–11. Two points in time are key: (1) when the criminal complaint was filed against Stillwagon on October 1, 2012, and (2) when, nearly four months later, the Delaware County grand jury indicted Stillwagon on four counts of felonious assault.

### (1) Criminal Complaint

The criminal complaint alleged that Stillwagon committed felonious assault when he purportedly shot at Mattingly "six times, ultimately striking [him] in the head." (Crim. Compl., at 1 [ECF No. 205–2].) When this complaint was filed on the morning of October 1, the officers knew essentially the same as they did when Stillwagon was arrested the night before. Segaard and Gerke had, however, learned more about Mattingly's condition: they discovered that Mattingly had left the hospital without being discharged. (Segaard Investigation Report at PageID 4578 [ECF No. 160–4].)

The allegation that Stillwagon shot at, and missed, Mattingly five times is essentially the same as the allegation, discussed in the false arrest section, that Stillwagon fired shots that hit Mattingly's truck. And for the same reasons that a jury could reasonably find a lack of probable cause to arrest Stillwagon regarding the shots that hit Mattingly's truck, a jury could also reasonably find a lack of probable cause to prosecute Stillwagon based on those shots.

As to the allegation that Stillwagon shot Mattingly in the head, a jury could also reasonably find that the officers lacked probable cause to prosecute Stillwagon based on that assertion. Stillwagon had told the officers that he hit Mattingly on the head. (Stillwagon Interview Tr. 2 at 51 [ECF No. 160–11].) And although Stillwagon acknowledged that his pistol fired when he hit Mattingly, he did not believe that the bullet struck Mattingly. (*See id.* at 51–52; Stillwagon Interview Tr. 1 at 21 [ECF No. 160–10].) Mattingly's condition at the scene—talking and alert—supported Stillwagon's assertion that Mattingly had not been shot. (*See* Segaard Dep. Vol. I at 75–76 [ECF No. 160–1]; Willauer Dep. Vol. II at 129 [ECF No. 157–1].) And other evidence available to the officers—the Eagles Lodge video, the absence of a shell casing on the ground near the driver side of the truck, and the presence of an empty shell casing in the chamber of Stillwagon's pistol—supported this assertion too. (*See* Eagles Video at 15:31:31 to 15:31:49; Wilgus Aff. ¶¶ 20, 41–45 [ECF No. 232–1].)

### (2) Indictment

Stillwagon was indicted on four counts of felonious assault. (Indictment at 1–4 [ECF No. 203–2].) Three of the counts alleged that Stillwagon had attempted to shoot Mattingly; the fourth count alleged that Stillwagon had used his pistol to cause serious physical harm to Mattingly. (Bill of Particulars at 1–2 [ECF No. 205–8].) The officers had acquired additional information about the case (detailed in the background section) by the time the indictment was issued. Segaard had received statements from several witnesses. Segaard and Gerke had interviewed Mattingly. And Segaard had learned more about Mattingly's injuries.

This new information, when viewed in the light most favorable to Stillwagon and coupled with the existing evidence, showed that probable cause was lacking for the indictment's first three felonious assault charges. Lois Reninger's statement, for ex-

ample, that Mattingly may have waited by Section Line Road to reengage Stillwagon suggested that Stillwagon did not chase Mattingly to the William Street exit and, consequently, that Stillwagon was not attempting to shoot Mattingly when he fired the shots that hit the truck. (Oct. 2, 2012 Reninger Email at PageID 5111 [ECF No. 162–6].) The other witness statements, which described aggressive driving only on Mattingly's part, also suggested that Stillwagon was not the aggressor in the incident and, thus, was not attempting to shoot Mattingly. (*See* Bickham Call at 3–5 [ECF No. 162–3]; Cogan Call at 4–8 [ECF No. 162–10]; Sayre Call at 4–5 [ECF No. 205–5].)

This new information, again viewed in the light most favorable to Stillwagon and coupled with evidence already supporting Stillwagon's assertion of self-defense, showed that probable cause was also lacking for the indictment's fourth felonious assault charge. Stillwagon's assertion of self-defense on this charge was strongest if the evidence showed that he simply hit Mattingly with the pistol. And at least two pieces of evidence discovered by the defendant officers after the arrest indicated that Mattingly was, indeed, hit on the head and not shot. Daniel Powell, the third-party witness to the events in the AutoZone parking lot who provided an account not contradicted by the Eagles Lodge video, described Mattingly driving directly at Stillwagon and then Stillwagon walking around the back of the truck and hitting Mattingly on the head. (*See* Cruiser 66 Video at 15:40:53 to 15:41:12; Eagles Video at 15:31:31 to 15:31:49.) Also, Segaard viewed Mattingly's head injury and noted that it was inconsistent with a point-blank gunshot wound. (*See* Segaard Investigation Report at PageID 4579–80 [ECF No. 160–4].) This observation suggested that Mattingly was either shot from a distance (an event not depicted in the Eagles Lodge video) or injured by physical contact with

Stillwagon's pistol. (*See* Eagles Video at 15:31:31 to 15:31:49.)

Based on all the information known to the officers, including the information described above in the section on absolute immunity, a jury could reasonably conclude that the officers lacked probable cause to prosecute Stillwagon, irrespective of his eventual indictment by the grand jury. *See King*, 852 F.3d at 580–91. Consequently, the evidence, when viewed in the light most favorable to Stillwagon, shows that the officers maliciously prosecuted him.

### ii. Clearly Established Right

The officers are entitled to qualified immunity if their actions did not violate a clearly established right of which a reasonable official would have known. *See Bell*, 308 F.3d at 601. Here, however, the contours of the right to be free from malicious prosecution were sufficiently clear by the dates at issue to give a reasonable official fair warning that Stillwagon's prosecution was unconstitutional if initiated or maintained without probable cause. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 & n. 19 (6th Cir. 1999); *see also King*, 852 F.3d at 582–83 ("[Individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." (quoting *Webb*, 789 F.3d at 660, 665)). As such, a jury could reasonably conclude that the officers' actions violated a clearly established right.

The Municipal Defendants' request for summary judgment on Stillwagon's § 1983 malicious prosecution claim is, accordingly, denied.

### 2. Stillwagon's Motion for Summary Judgment

Stillwagon alleges that he was maliciously prosecuted by Segaard, Willauer, Gerke, and Radabaugh. (Pl.'s First Mot. for Summ. J. at 1 [ECF No. 205].) Stillwagon only moves for summary judgment against Segaard and Willauer though. (*Id.*) He contends that no jury could reasonably find for the Municipal Defendants on his § 1983 malicious prosecution claim. (*See id.* at 75.) Stillwagon's motion fails.

As noted earlier, a jury could reasonably conclude that the officers had probable cause to arrest Stillwagon. This same evidence could also support a jury in reasonably concluding that the officers had probable cause to prosecute Stillwagon.

The information discovered by the officers after Stillwagon's arrest, when viewed in the light most favorable to the Municipal Defendants, does not alter this conclusion. Although much of the evidence discovered after the arrest could support Stillwagon's assertion that he did not attempt to shoot Mattingly and acted in self-defense when he hit Mattingly on the head, much of the same evidence could also support the officers' position—that Stillwagon attempted to shoot Mattingly, not the truck, and that Stillwagon then shot or struck Mattingly in the head out of aggression, not self-defense. For example, Stillwagon's statement to Deputy Pitts, "I shot the fucker. I don't think he's shot[,]" (Pitts Cruiser Video at 15:36:48), accompanied by the paramedic statements about Mattingly being grazed in the head, (*see* Willauer Dep. Vol. II at 130 [ECF No. 157–1]), suggests that Stillwagon shot Mattingly in the head and, therefore, would have needed to satisfy a duty to retreat in order to prevail on a self-defense claim, *see* O.R.C. § 2903.11 (A); *Dale*, 2013-Ohio-2229, ¶ 15. Lois Reninger's testimony that Stillwagon said he was going to "get the son of a bitch," (Reninger Dep. at

55–56 [ECF No. 198–1]), could suggest that Stillwagon was trying to shoot Mattingly, not the truck, when he fired his pistol. The Eagles Lodge video could be interpreted as depicting Stillwagon acting as an aggressor when it shows Stillwagon walking toward and around the back of Mattingly's stationary truck and then making what appears to be a downward motion with his arm near the driver-side door. (*See* Eagles Video at 15:31:31 to 15:31:49.) And Daniel Powell's testimony of Stillwagon striking the seemingly unaggressive and unarmed Mattingly, (*see* Powell Dep. at 40 [ECF No. 181–1]), could also support the conclusion that Stillwagon was acting as an aggressor when he struck Mattingly with his pistol.

Because a jury could reasonably conclude that Segaard and Willauer had probable cause to prosecute Stillwagon, Stillwagon's request for summary judgment on his § 1983 malicious prosecution claim is denied.

### D. Civil Conspiracy under § 1983

The Municipal Defendants contend that qualified immunity entitles Segaard, Gerke, Radabaugh, and Willauer to summary judgment on Stillwagon's § 1983 civil conspiracy claim. (Defs.' Mot. for Summ. J. at 27 [ECF No. 203].) This argument is not well taken.

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a § 1983 civil conspiracy claim, a plaintiff must show that (1) a single plan existed, (2) the alleged coconspirator shared in the general conspiratorial objective, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id.* Vague and conclusory allegations unsupported by material facts are insuffi-

cient to state a claim. *Id.* A plaintiff, however, need not allege or produce direct evidence of a conspiracy; "circumstantial evidence may provide adequate proof." *Id.* (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

 The Municipal Defendants contend that Stillwagon has failed to produce any evidence to support his civil conspiracy claim. (Defs.' Mot. for Summ. J. at 27.) But the Court disagrees. Based on the evidence produced, a jury could reasonably conclude that the officers entered into an agreement to falsely arrest and maliciously prosecute Stillwagon. The existence of a single plan to accomplish the officers' shared objective is evidenced by Segaard's testimony, which shows, when viewed in the light most favorable to Stillwagon, that Segaard conversed with the other officers around the time of Stillwagon's interview and that they decided as a unit to file the criminal complaint against Stillwagon. (*See* Segaard Dep. Vol. I at 87–88, 149–50 [ECF No. 160–1] (Segaard: "I don't know if [Radabaugh] specifically ordered me [to file the charges] or not; but I'm sure that as a unit, it was accepted that that's what we were going to do."); Segaard Dep. Vol. II at 526–27 [ECF No. 162–1] (explaining that it was the "group consensus" that Mattingly was the victim during the incident in the parking lot).) The officers' knowledge of the evidence in the case—which does not establish probable cause to arrest or prosecute Stillwagon when viewed in the light most favorable to him—indicates that the officers entered into the alleged agreement to unlawfully injure Stillwagon. And the overt actions in furtherance of the alleged conspiracy were Stillwagon's arrest and the filing of the criminal complaint.

Viewed in the light most favorable to Stillwagon, the evidence shows that the officers violated Stillwagon's constitutional rights. And given that the contours of the right to be free from false arrest and malicious prosecution were sufficiently clear by the relevant time to give a reasonable official fair warning that Stillwagon's arrest and prosecution were unconstitutional, *see Parsons*, 533 F.3d at 504; *Spurlock*, 167 F.3d at 1006 & n.19, a jury could reasonably conclude that the officers' actions violated clearly established rights.

The Municipal Defendants' request for summary judgment on Stillwagon's § 1983 civil conspiracy claim is denied.

**E. Supervisory Liability**

The Municipal Defendants contend that Willauer and Radabaugh, supervisors at the Delaware Police Department, are entitled to qualified immunity because (i) their subordinates (i.e., Segaard and Gerke) did not engage in any unconstitutional conduct and (ii) they did not directly participate in any of the alleged unconstitutional conduct. (Defs.' Mot. for Summ. J. at 25–26 [ECF No. 203].) [21]

 A government official may not be held liable for the unconstitutional conduct of a subordinate under a respondeat superior or vicarious liability theory. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). "In other words, a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.* A supervisor's mere failure to act is therefore insufficient to establish supervisory liability. *Id.* To hold a supervisory official liable under § 1983, a plaintiff must demonstrate

---

**21.** Stillwagon asserts a supervisory liability claim with respect to the § 1983 false arrest, malicious prosecution, and civil conspiracy claims. (*See* Am. Compl. ¶ 173 [ECF No. 78].)

Stillwagon does not bring a supervisory liability claim regarding the § 1983 excessive force claim. (*See* '1606 Compl. ¶¶ 48–51 ['1606 ECF No. 1].)

that the actor engaged in some active unconstitutional behavior. *Id.*; *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). That is, a supervisor may only be held liable where he has " 'encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.' " *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).

### 1. Willauer

Given that Willauer only became a supervisor after the events relevant to this case, Stillwagon acknowledges that he cannot state a supervisory liability claim against him. (Pl.'s Opp'n to Mot. for Summ. J. at 1 [ECF No. 220].) Stillwagon's supervisory liability claim against Willauer is therefore dismissed.

### 2. Radabaugh

The Municipal Defendants aver that Radabaugh is entitled to qualified immunity; as such, the Court first considers whether a constitutional violation has occurred and then determines whether the constitutional right allegedly violated by Radabaugh was clearly established. *See Bell*, 308 F.3d at 601.

#### a. Constitutional Violation

As explained earlier, the evidence shows, when viewed in the light most favorable to Stillwagon, that Segaard and Gerke violated Stillwagon's constitutional rights by conspiring against him and falsely arresting and maliciously prosecuting him.

The next inquiry is whether Radabaugh directly participated in his subordinates' alleged unconstitutional behavior. Radabaugh came to the AutoZone parking lot after receiving word of the incident. (*See* Radabaugh Dep. Vol. I at 54–55 [ECF No. 193–1].) He learned of, and helped to document, evidence at the scene. (*See id.* at 76–78.) He learned (potentially before Stillwagon's arrest) of evidence suggesting that Stillwagon did not attempt to shoot Mattingly and that Stillwagon had acted in self-defense, including the presence of an empty shell casing in the chamber of Stillwagon's pistol (suggesting that the gun was in contact with something when it fired), the absence of shell casings around the truck, the absence of bullet holes in the truck's cab, the absence of blood spatter consistent with a gunshot wound, the motorcycle's position near the concrete pillar, and the contents of Mattingly's truck (beer cans and a baseball bat, as relevant here). (*See id.* at 76–78; Radabaugh Dep. Vol. II at 206–09, 227, 240–41, 292–93 [ECF No. 196–1].) He watched the Eagles Lodge video (potentially before Stillwagons arrest), which showed Mattingly leave the parking lot, re-enter the lot, maneuver around a large planter, and then drive directly toward Stillwagon. (*See* Radabaugh Dep. Vol. 1 at 91–93, 98–100.) He called the local hospital to determine where Mattingly had been taken for treatment. (*See id.* at 64.) He has acknowledged that, on September 30, he did not know the source of Mattingly's injury (i.e., whether it was a gunshot wound or the result of blunt force trauma). (*See id.* at 80.) He observed a portion of Stillwagon's interview with Segaard and Gerke. (*See id.* at 78.) He spoke with Gerke about how the investigation would move forward. (Gerke Investigation Report at PageID 4573 [ECF No. 160–4].) And, according to Segaard, Radabaugh ordered Segaard to direct Willauer to file the criminal complaint against Stillwagon. (Segaard Dep. Vol. I at 149–50 [ECF No. 160–1].)

Radabaugh continued his direct involvement in the case after the criminal complaint was filed. Radabaugh recovered the

surveillance video from the Marathon station at the intersection of Routes 42 and 33. (*See* Radabaugh Dep. Vol. 1 at 122.) He instructed Segaard to speak with a news crew about the case. (Segaard Dep. Vol. II at 488–89 [ECF No. 162–1].) He reviewed the physical and forensic evidence from Mattingly's truck. (*See* Radabaugh Dep. Vol. II at 206–08, 226–27.) And he read Segaard and Gerke's investigation reports and approved of the steps they were taking to investigate the case. (*See* Radabaugh Dep. Vol. I at 50–51, 116–17; Radabaugh Dep. Vol. II at 237–38.)

Based on this evidence, a jury could reasonably conclude that Radabaugh directly participated in his subordinates' alleged unconstitutional behavior. Consequently, the evidence shows, when viewed in the light most favorable to Stillwagon, that Radabaugh violated Stillwagon's constitutional rights.

### b. Clearly Established Right

When Radabaugh directly participated in Stillwagon's arrest and prosecution, the contours of the right to be free from arrest and prosecution, unless based on probable cause, were sufficiently clear to give a reasonable official fair warning that the conduct at issue was unconstitutional. *See Parsons*, 533 F.3d at 504; see also *Courtright*, 839 F.3d at 520; *Spurlock*, 167 F.3d at 1006 & n.19. Consequently, a jury could reasonably conclude that Radabaugh's actions violated a clearly established right.

The Municipal Defendants' request for summary judgment on Stillwagon's supervisory liability claim against Radabaugh is denied.

### F. Excessive Force

The parties have filed cross-motions for summary judgment on Stillwagon's § 1983 excessive force claim against Ailes and Flynn. Excessive force claims are analyzed under the Fourth Amendment's reasonableness standard.

*Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008). Thus, to prevail on an excessive force claim, a plaintiff must establish that (1) he was subjected to a "seizure" within the meaning of the Fourth Amendment and (2) the seizure was unreasonable. *Id.* Here, the parties only dispute the second element—the reasonableness of the seizure.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Because the standard is objective, it does not take into account the underlying intent or motivation of the officer. *Slusher*, 540 F.3d at 455.

" 'Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Slusher*, 540 F.3d at 455 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865) (internal quotation marks omitted). Because the test of reasonableness under the Fourth Amendment " 'is not capable of precise definition or mechanical application.' " a court must consider all of the facts and circumstances of each particular case. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). A court should consider, among any other relevant factors, (i) the severity of the crime at issue, (ii) whether the suspect posed an immediate threat to the safety of the officers or others, and (iii) whether suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.*

## 1. The Municipal Defendants' Motion for Summary Judgment

The Municipal Defendants insist that qualified immunity entitles Ailes and Flynn to summary judgment on Stillwagon's excessive force claim. (*See* Defs.' Mot. for Summ. J. at 19–24 [ECF No. 203].) Their argument is not well taken.

Stillwagon's excessive force claims stems from two separate incidents: (1) when Ailes inserted Stillwagon into the police cruiser while Stillwagon's hands were cuffed behind his back and (2) when Flynn taped plastic evidence bags over Stillwagon's hands. (*See* Pl.'s Second Mot. for Summ. J. at 1–3 [ECF No. 206]; Pl.'s Opp'n to Mot. for Summ. J. at 34 [ECF No. 220].) [22]

To determine whether Ailes and Flynn are entitled to qualified immunity, the Court first considers whether a constitutional violation has occurred. *See Bell*, 308 F.3d at 601. The Court then decides whether the constitutional right was clearly established. *See id.*

### a. Ailes

#### i. Constitutional Violation

Because the Municipal Defendants do not dispute that Stillwagon was subjected to a seizure, the Court's inquiry focuses on whether Ailes's use of force was unreasonable.

 Stillwagon was polite and cooperative with Deputy Pitts and the Delaware police officers he interacted with in the AutoZone parking lot. (*See, e.g.,* Ailes Dep. at 167–70 [ECF No. 54–2]; Pitts Cruiser Video at 15:36:48 to 15:38:17; Willauer Dep. Vol. 1 at 110–11 [ECF No. 52–1].) He waved Pitts over to the truck and informed him that he had fired the pistol. (Pitts Cruiser Video at 15:36:48.) Stillwagon then

explained that Mattingly had just tried to kill him six times. (*Id.* at 15:36:51.) Stillwagon did not attempt to flee. (*Id.* at 15:36:48 to 15:38:17.) He informed Pitts that his pistol was sitting on the planter by the entrance to the parking lot, and he complied with Pitts's instructions to lie on the ground and to roll onto his stomach. (*Id.* at 15:37:00 to 15:38:17.) Stillwagon did not resist as Pitts double cuffed him behind the back. (*Id.* at 15:38:17.)

Ailes arrived at the AutoZone parking lot seconds after Flynn. He saw Stillwagon, the presumed suspect, handcuffed and lying face down. (Ailes Dep. at 153.) And he saw Mattingly, the presumed victim, lying on the ground and bleeding from the head. (*Id.*)

Ailes has testified that he found Stillwagon to be respectful and cooperative. (Ailes Dep. at 167–70.) Ailes did not observe Stillwagon engage in any threatening or resistive behavior. (*Id.* at 169.) Stillwagon obeyed Ailes's commands as best as he could. (*Id.* at 167.) And Ailes did not see Stillwagon disobey the commands of any other officers either. (*Id.*) Ailes did not suspect that Stillwagon had consumed any drugs or alcohol. (*Id.* at 166–67.) And Ailes acknowledges, and observed at the time, that Stillwagon is a large, wide-shouldered individual. (*See id.* at 163.)

When Pitts walked toward William Street to secure the pistol sitting on the planter, Ailes took charge of Stillwagon. (*See* Cruiser 62 Video at 15:39:56; Pitts Cruiser Video at 15:39:13.) Ailes decided that he would move Stillwagon and place him in the back of a police cruiser. (*See* Cruiser 62 Video at 15:39:56.) To that end, he instructed Stillwagon to roll onto his butt so he could stand up. (Cruiser 62 Video at 15:40:00.) As he attempted to sit

---

22. Stillwagon has represented that he is not asserting a claim stemming from his initial handcuffing by Deputy Pitts or from the later

tightening of his handcuffs. (Pl.'s Opp'n to Mot. for Summ. J. at 34.)

up, Stillwagon advised Ailes that he has "a fake shoulder and two fake knees," so he would need assistance. (*Id.* at 15:40:03.) After Stillwagon got to his feet, Ailes guided Stillwagon to the rear driver-side door of a nearby cruiser. (*See id.* at 15:40:13; Pitts Cruiser Video at 15:39;56 to 15:40:21.)

Before attempting to place Stillwagon in the cruiser, Ailes inquired about the handcuffs. (Cruiser 62 Video at 15:40:35.) Stillwagon asked if his hands could be cuffed in front of his body, to which Ailes responded. "[n]o, I can't let you go front." (*Id.* at 15:40:36 to 15:40:39.)

Ailes then instructed Stillwagon to put his butt into the back seat first. (Cruiser 62 Video at 15:40:33.) As Stillwagon attempted to sit down, he stated that his shoulders were "tucked up" and that Ailes should, "[w]ait a minute." (*Id.* at 15:40:40.) Upon sitting down, Stillwagon stated that he did not think that his fitting in the back seat was going to work. (*Id.* at 15:40:46.) Ailes, nonetheless, began pushing Stillwagon into the vehicle. (*See* Stillwagon Dep. Vol. II at 426 [ECF No. 200–2].) Stillwagon quickly suggested that he lie flat on his stomach, and he asked Ailes to grab his legs. (Cruiser 62 Video at 15:40:49.) As Ailes pushed Stillwagon's legs, Stillwagon told him several times to wait, that he was caught, and that he was having spasms in his shoulder. (*Id.* at 15:40:55 to 15:41:06.) Ailes advised Stillwagon to lie down, and he continued to push Stillwagon into the vehicle. (*Id.* at 15:41:06.) Stillwagon indicated that he did not think he could lie down and that they should wait. (*Id.* at 15:41:08.) Stillwagon again reminded Ailes that he has a fake shoulder. (*Id.* at 15:41:10.) With his hands still cuffed behind his back. Stillwagon eventually rolled to his stomach. (*See* Stillwagon Dep. Vol. II at 428.) Ailes then attempted to shut the cruiser's door. (*Id.* at 427.) The door bounced off Stillwagon's feet. (*Id.*) On the

second try, Ailes shut the door, pushing Stillwagon's feet with the door in the process. (*Id.* at 427–28.)

The facts and circumstances here pull in different directions. The potential crime at issue was severe. Stillwagon had admitted to firing his pistol at Mattingly's truck and to hitting Mattingly on the head. (*See* Stillwagon Interview Tr. 1 at 19–20 [ECF No. 160–10]; Stillwagon Interview Tr. 2 at 51 [ECF No. 160–11].) And as Ailes testified during his deposition, Mattingly was on the ground, bleeding from the head when he and the other officers arrived at the AutoZone parking lot. (*See* Ailes Dep. at 153.) Stillwagon was not arrested or charged with a crime at the scene, but he was later charged with felonious assault. (Crim. Compl. at 1 [ECF No. 205–2].) That Stillwagon's hands were double cuffed, resulting in less pull on his shoulders and wrists than if he had been single cuffed, (*see* Ailes Dep. at 163, 166), also suggests that Ailes's use of force was reasonable.

The other factors, however, all indicate that the force used by Ailes was unreasonable and, thus, excessive. Stillwagon did not pose an immediate threat to the safety of the officers. (*See* Ailes Dep. at 167–70.) Nor was Stillwagon actively resisting arrest or attempting to evade arrest by flight. (*See id.*) Stillwagon was cuffed, cooperative, and polite. (*See id.*) Stillwagon, moreover, is a large, wide-shouldered individual with reconstructed knees and shoulders. (*See id.* at 163.) Although aware of Stillwagon's physical limitations and polite and cooperative behavior toward him and the other officers, Ailes refused to transfer the handcuffs to the front of Stillwagon's body. *See Crooks v. Hamilton Cnty., Ohio*, 458 Fed.Appx. 548, 549–50 (6th Cir. 2012) (finding a triable issue of fact over excessive force where the defendant police officer handcuffed the plaintiff behind the back even though the plaintiff "posed no

threat to the officer or anyone else" and had "asked to be handcuffed in front instead of behind the back because of her medical condition"); *Walton v. City of Southfield*, 995 F.2d 1331, 1334, 1341–42 (6th Cir. 1993) (affirming the denial of qualified immunity where the defendant officer handcuffed the plaintiff behind the back despite her pleas that she not be handcuffed in that way because of an injured shoulder); *Ferguson v. Hall*, 33 F.Supp.2d 608, 612–13 (E.D. Mich. Jan. 28, 1999) (finding no entitlement to qualified immunity where the plaintiff showed the officer his "deformed" arm and requested to be handcuffed in the front of his body but the officer ignored the request and forcefully handcuffed the plaintiff behind his back). And although aware of Stillwagon's limitations and demeanor, Ailes pushed Stillwagon into the back seat of a police cruiser—and continued to push even as Stillwagon expressed his discomfort and reservations about the endeavor. *See Vance v. Wade*, 546 F.3d 774, 783–86 (6th Cir. 2008) (finding no entitlement to qualified immunity where the defendant officer forcefully placed the plaintiff in the back of a police car); *cf. Meirthew v. Amore*, 417 Fed.Appx. 494, 499 (6th Cir. 2011) ("[O]ur prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject....").

Ailes has since testified that he refused to cuff Stillwagon in the front of his body because it was not the Delaware Police Department's "standard procedure." (Ailes Dep. at 166, 174 (Q: "There wasn't any specific interest [in keeping Stillwagon cuffed behind the back]. It was just a matter of following what's customary and routine in your department." A: "Correct.").) Ailes's reliance on the Depart-

ment's standard procedure potentially conflicts though with Ailes's training and with the Department's written policies, which instruct officers to exercise discretion in determining whether and how to handcuff a person in custody. (*See* Student Performance Objective at PageID 585 [ECF No. 51–3]; Arrest/Slate Procedure at PageID 597 [ECF No. 51–3]; Resp. to Resistance Policies at PageID 601 [ECF No. 51–3].) That Ailes may have made the decision to keep Stillwagon handcuffed behind the back based on a "standard procedure" that, in conflict with the Department's training and written policies, does not allow for the exercise of discretion could lead a reasonable jury to conclude that Ailes's use of force was unreasonable. *See Turek v. Saluga*, 47 Fed.Appx. 746, 750 (6th Cir. 2002).[23]

The Municipal Defendants argue that Ailes did not use unreasonable force because Stillwagon did not "cry out, or grunt or make any noises that would indicate that he was in pain." (Defs.' Reply in Supp. of Mot. for Summ. J. at 20 [ECF No. 233].) This assertion is belied by the audio recording of the incident. Stillwagon asks Ailes to wait numerous times, he states that he is caught, and he mentions his fake shoulder and that he is experiencing shoulder spasms.

■■■ The Municipal Defendants also point out that there was no "physical struggle" and that Stillwagon and Ailes W'ere "working together to get [Stillwagon] into the cruiser." Each of these assertions is true. But neither undermines a finding that Ailes used unreasonable force. Ailes subjective intent or motivation does not factor into the reasonableness analysis. *See Slusher*, 540 F.3d at 455. And although

---

**23.** To be clear, the Court does not find that handcuffing Stillwagon behind the back amounts to an unreasonable use of force. Instead, this analysis is based on the hand- cuffing, the placement of Stillwagon in the vehicle, the pushing him into the cruiser, and the closing of the door.

Stillwagon's cooperation throughout the process is a factor for the Court to consider, Stillwagon's cooperation suggests that Ailes should have used less force in placing Stillwagon into the cruiser. *Cf. Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."). Using force to place an *uncooperative* suspect into the back of a cruiser would make more sense from the perspective of a reasonable officer on the scene.

A jury could reasonable conclude that Ailes's use of force was objectively unreasonable. And, consequently, the evidence, when viewed in the light most favorable to Stillwagon, shows that Ailes used excessive force in violation of Stillwagon's constitutional rights.

### ii. Clearly Established Right

Ailes is entitled to qualified immunity if his actions did not violate a clearly established right of which a reasonable official would have known. *See Bell*, 308 F.3d at 601. Here, though, the contours of the right to be free from excessive force were sufficiently clear by September 30, 2012, to give a reasonable official fair wanting that the conduct at issue was unconstitutional. *See Crooks*, 458 Fed.Appx. at 549–50; *Dixon v. Donald*, 291 Fed.Appx. 759, 762–63 (6th Cir. 2008); *Walton*, 995 F.2d at 1334, 1341–42; *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) ("We have repeatedly stated that 'the right to be free from excessive force is a clearly established Fourth Amendment right.'" (quoting *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001))). And a jury could therefore reasonably conclude that Ailes violated a clearly established right when he inserted Stillwagon into the police cruiser while Stillwagon's hands were cuffed behind his back.

### b. Flynn

Flynn purportedly used excessive force when he taped plastic evidence bags over Stillwagon's hands. The Court first considers whether this amounts to a constitutional violation.

### i. Constitutional Violation

As an initial matter, the Municipal Defendants urge the Court to analyze Flynn's actions under the standard used by the Eastern District of New York in *Crockett v. New York*, No. 11–cv–4378, 2015 WL 5719737, at *8 (E.D.N.Y. Sept. 29, 2015), a case in which the police bound the plaintiff's hands using electrical tape. In determining whether the use of tape constituted excessive force, the *Crockett* court applied the standard that it utilizes in cases where the plaintiff has complained of unduly tight handcuffing. *See Crockett*, 2015 WL 5719737, at *8. The court considered "(1) whether the handcuffs were too tight; (2) whether the defendant-officers ignored the plaintiff-arrestee's complaints about the handcuffs being too tight; and (3) the degree of injury caused by the handcuffing." *Id.*

The Court declines this invitation to adopt the *Crockett* standard. The analysis from *Crockett* is not properly applied here because the purpose of the force used by the police differs from that case to the present one. The police used electrical tape as a substitute for handcuffs in *Crockett*; as such, the Eastern District of New York appropriately relied on a standard for analyzing the reasonableness of handcuffing. *See Crockett*, 201 5 WL 5719737, at *8. Flynn's use of tape, by contrast, was not a substitute for handcuffs. Stillwagon's hands were bound first with double handcuffs and later with ankle restraints. (*See* Flynn Dep. at 103, 178 [ECF No. 53–1].) The tape was to secure bags, intended to preserve gunshot residue, over Stillwagon's hands. (*See* Stillwagon Interview Tr. 1

at 2–3 [ECF No. 160–10].) Instead of applying the *Crockett* standard, the Court will consider the reasonableness of Flynn's action under the standard outlined in *Graham*—that is, by analyzing all of the facts and circumstances, including the severity of the crime at issue, whether Stillwagon posed an immediate threat, and whether Stillwagon was actively resisting arrest or attempting to evade by flight. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

▇▇▇ Flynn interacted with Stillwagon in the AutoZone parking lot. (*See* Flynn Investigation Report at PageID 4636 [ECF No. 160–5].) He then drove Stillwagon to the police station, where, at Gerke's request, he taped bags around Stillwagon's hands. (*See id.* at PageID 4636–37; Flynn Dep. at 170.) Segaard cut the tape and removed the bags at the beginning of Stillwagon's police station interview so that he could complete the gunshot residue tests on Stillwagon's hands. (*See* Stillwagon Interview Tr. 1 at 2–6.)

Several factors suggest that Flynn's use of force was reasonable. The crime at issue was potentially severe. And although Flynn mistakenly used plastic bags when he should have used paper bags, the purpose of taping bags over Stillwagon's hands was to advance an important law enforcement and investigative interest—preserving gunshot residue. (*See* Stillwagon Interview Tr. 1 at 2–3.) Also, despite Stillwagon's testimony that his hands were numb and tingling from the tight tape, Stillwagon does not claim to have informed Flynn of those issues. (Stillwagon Dep. Vol. II at 451 [ECF No. 200–2].)

The other relevant factors, however, suggest that Flynn's use of force was unreasonable. Flynn has testified that he, like Ailes, found Stillwagon to be respectful and cooperative. (Flynn Dep. at 181.) Stillwagon did not present an immediate threat to Flynn or to any other officer's safety. (*See id.* at 182.) Nor was Stillwagon

actively resisting arrest or attempting to escape. (*See id.* at 182–83.) Stillwagon was secured and at the police station when the bags were taped over his hands. (*See* Flynn Dep. at 102–03, 170.) That Flynn used plastic bags, which allegedly caused Stillwagon's hands to perspire, and that Flynn purportedly applied the tape "tourniquet tight" and cut off the blood (low to Stillwagon's wrists, also suggests that Flynn's use of force was unreasonable. (*See id.* at 172; Stillwagon Dep. Vol. II at 444–46.) Moreover, Stillwagon has testified that he told Flynn that his "wrists are all screwed up," and Flynn has acknowledged that he may have heard Stillwagon discuss his prior wrist injuries. (*See* Flynn Dep. at 179–80; Stillwagon Dep. Vol. II at 404 (internal quotation marks omitted).) And Stillwagon has also testified that he informed Flynn after the bags were taped around his hands that his wrists were "killing" him but that Flynn "wasn't going to take the bag[s] off" his hands. (Stillwagon Dep. Vol. II at 446 (internal quotation marks omitted).)

When the evidence is viewed in the light most favorable to Stillwagon, it shows that Flynn tightly taped plastic bags around Stillwagon's hands despite his knowledge of Stillwagon's prior wrist injuries and that Flynn refused to remove the bags despite Stillwagon's complaint of wrist pain. (*See* Stillwagon Dep. Vol. II at 404, 444–46.) Given these facts and circumstances, a jury could reasonably conclude that Flynn's actions were objectively unreasonable. And consequently, Flynn's actions amount to a constitutional violation when the evidence is viewed in the most favorable light.

### ii. Clearly Established Right

If Flynn's actions did not violate a clearly established right of which a reasonable official would have known, Flynn is entitled to qualified immunity. *See Bell*, 308

F.3d at 601. But, again, the contours of the right to be free·from excessive force were sufficiently clear by September 30, 2012, to give a reasonable official fair warning that the conduct at issue was unconstitutional. *See Meirthew,* 417 Fed.Appx. at 499; *Baker,* 471 F.3d at 607; *see also Champion,* 380 F.3d at 902. And, therefore, a jury could reasonably conclude that Flynn violated a clearly established right when he taped plastic bags over Stillwagon's hands.

### 2. Stillwagon's Motion for Summary Judgment

Stillwagon requests summary judgment on his excessive force claims·against Ailes and Flynn. This request is not well taken.

The Municipal Defendants have pointed to sufficient evidence to create a jury question on whether Ailes and Flynn used excessive force on Stillwagon. Given the severity of the potential crime and given that Stillwagon was doubled cuffed, (*see* Crim. Compl. at 1 [ECF No. 205–2]; Pitts Cruiser Video at 15:38:17), a jury could reasonably conclude that Ailes used reasonable force when he placed Stillwagon in the back of the police cruiser while Stillwagon's hands were cuffed behind the back. And a jury could also reasonably conclude that Flynn used reasonable force given Flynn's testimony that (i) he did not remember hearing Stillwagon complain about wrist pain or prior injuries and (ii) the plastic bags were not taped very tightly. (*See* Flynn Dep. at 104, 172 [ECF No. 53–1].)

### G. Municipal Liability

Next before the Court are the parties' cross-motions for summary judgment on Stillwagon's § 1983 municipal liability claim against The City of Delaware.

▮▮▮▮ A municipality may be held liable under § 1983 "only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino,* 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc.·Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A plaintiff may attempt to prove a municipality's illegal policy by alleging: " '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) ·the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to]· federal rights violations.' " *Id.* (quoting *Burgess v. Fischer,* 735 F.3d 462, 478 (6th Cir. 2013)).

Stillwagon advances several theories of municipal liability: (i) that Chief Pijanowski ratified the decision to arrest Stillwagon; (ii) that the City ratified the purported excessive force suffered by Stillwagon by failing to subsequently investigate the officers' use of force; (iii) that the City failed to properly train its police officers (Segaard and Gerke, in particular) on the determination of probable cause and on the· role of self-defense in the · probable cause analysis; (iv) that the City failed to properly supervise Segaard and Gerke; and (v) that an unwritten custom at the Delaware Police Department required that all persons being detained or arrested be handcuffed behind the back. (Pl.'s Opp'n to Mot. for Summ. J. at 46–54 [ECF No. 220]; Pl.'s Third Mot. for Summ. J. at 3 [ECF No. 207].)

Because the Municipal Defendants are entitled to summary judgment on Stillwagon's municipal liability claim, the Court only discusses their request for summary judgment.

### 1. Ratification of. Stillwagon's Arrest

▮▮▮▮ Under a ratification theory, a single decision can constitute a municipal

policy "if that decision is made by an official who 'possesses final authority to establish municipal policy with respect to the action ordered.' which means that his decisions are 'final and unreviewable and are not constrained by the official policies of superior officials.'" *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013) (internal citations omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005)). A final decision maker ratifies a subordinate's action if the decision maker provides "affirmative approval of a particular decision made by [the] subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). A decision maker's "mere acquiescence in a single discretionary decision by a subordinate" is, by contrast, insufficient to show ratification. *Id.*

■ For his first theory of municipal liability, Still wagon argues that Chief Pijanowski ratified the decision to arrest him. This theory cannot survive summary judgment. First, Stillwagon has failed to produce evidence demonstrating that Pijanowski possessed final authority to establish municipal policy. Pijanowski acknowledged in his deposition that he was the ·highest ranking policy making official within the Delaware Police Department at the time of Stillwagon's arrest. (*See* Pijanowski Dep. at 29 [ECF No. 51–1].) However, the fact that Pijanowski is the highest ranking official in the department does not necessarily demonstrate that he possessed *final authority* to establish municipal policy. Citing Article X, Section 62 of the City's Charter, the Municipal Defendants contend that Pijanowski is not a final decision maker because he is subordinate to the City's Director of Public Safety. (*See* Defs.' Reply in Supp. of Mot. for Summ. J. at 22 [ECF No. 233].) The Charter states, in relevant part, that "[t]he Chief of the police department shall have control of the stationing and other disposition of all members of the force, under such rules and regulations as he/she may ˙ establish with the approval of the Director of Public Safety." (City Charter at 1 [ECF No. 233–1].) Stillwagon does not point to any evidence that calls this hierarchy into question. *Cf. Feliciano*, 988 F.2d at 656 (noting that the plaintiffs had made "no showing that the Director [of Public Safety] does not retain the power to review policy statements issued by the Chief of Police").

And second, even if the Court were to assume that Pijanowski is a final decision maker, Stillwagon has failed to present evidence from which a jury could reasonably conclude that Pijanowski affirmatively approved the purported false arrest. In support of his ratification theory, Stillwagon points to deposition testimony in which Segaard, after stating that Pijanowski did not "directly" order him to file the criminal complaint against Stillwagon, indicated that Radabaugh had instructed him to have Willauer file the complaint. (*See* Segaard Dep. Vol. I at 149–50 [ECF No. 160–1].) But the inference that Pijanowski may have affirmatively approved Radabaugh's decision to instruct Segaard to have Willauer file the complaint against Stillwagon is too tenuous to support a jury in finding in Stillwagon's favor on his ratification theory.

### 2. Ratification of Excessive Force

■ A municipality may also be held liable under a ratification theory where the responsible law enforcement official has "ratified" unconstitutional conduct by failing to meaningfully investigate complaints of constitutional violations. *Gorecki v. City of Cambridge*, No. C2–07–420, 2009 WL 3242296, at *2 (S.D. Ohio Oct. 8, 2009); *see Marchese v. Lucas*, 758 F.2d 181, 184, 188–89 (6th Cir. 1985) (concluding that a sheriff's failure to investigate the cause of an

inmate's injuries after the district court had ordered the sheriff's department to undertake an investigation "served to confirm the existence of an unstated 'policy' of toleration of illegal brutality toward any county prisoner who had threatened the life of a sheriff's deputy"); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246–48 (6th Cir. 1989) (finding that a sheriff's failure to investigate an incident of abuse, coupled with evidence that at least 14 other paraplegics had received similar abusive treatment, demonstrated a policy or custom of deliberate indifference to the needs of paraplegic inmates).

 "A municipality's failure to investigate claims of wrongful conduct, however, does not constitute a *per se* conclusion that the municipality has a policy of tolerating violations of citizens rights." *Gorecki*, 2009 WL 3242296, at *2. As the Sixth Circuit has warned, inferring a municipal-wide policy based solely on one instance of misconduct runs dangerously close to "the collapsing of the municipal liability standard into a simple *respondeat superior* standard." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005). Ultimately, the guiding principle with respect to all municipal liability claims still derives from the Supreme Court's decision in *Monell*, which provides for municipal liability only where "the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *see Bd. of Cnty. Comm'rs of Bryan Cnty Okla. v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("The plaintiff must... demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis deleted)); *Gorecki*, 2009 WL 3242296, at *2.

Here, although Stillwagon has presented evidence showing that the Delaware Police Department did not investigate the uses of force relevant to this case, Stillwagon has offered insufficient evidence demonstrating that this failure to investigate represented (by ratification) an official policy of the City that caused Ailes and Flynn to violate Stillwagon's constitutional rights. *See Monell* 436 U.S. at 694, 98 S.Ct. 2018; *D'Ambrosia*, 747 F.3d at 386. Stillwagon points to Pijanowski's admission that he has never initiated any type of discipline or retraining of an officer on issues related to use of force. (*See* Pijanowski Dep. at 115 [ECF No. 51–1].) And Stillwagon also points to Flynn's acknowledgement that he was unaware of any other Delaware police officer who had been disciplined or investigated regarding use of force. (*See* Flynn Dep. at 31 [ECF No. 53–1].) These admissions, however, do not demonstrate that the City has failed to investigate claims of excessive force. Pijanowski did not recall disciplining or retraining an officer; he did not discuss the occurrence or non-occurrence of *investigations*. (*See* Pijanowski Dep. at 115.) And the fact that Flynn could not recall an investigation into any other officer's use of force says little about whether prior uses of force should have been investigated but were not. Pijanowski's and Flynn's testimony cannot support a jury in reasonably concluding that the City has an official policy of not investigating allegations of excessive force. *See Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (affirming summary judgment for the city where the plaintiffs "produced no evidence indicating that the [c]ity either on this occasion or in the past failed to investigate and discipline the use of excessive force by its police personnel where such discipline was justified"); *cf. Thomas*, 398 F.3d at 433 (holding that a municipal liability claim could not survive summary judgment "without [the plaintiff] showing

more than [the officer's] potentially excessive use of force in this particular case"). Nor can this testimony support a jury in further concluding that such a policy caused Ailes and Flynn to violate Stillwagon's constitutional rights. *See Williams v. Ellington*, 936 F.2d 881, 885 (6th Cir. 1991) (holding that the defendant could not be held liable for the ratification of a search because the "single, isolated decision [could] hardly constitute the 'moving force' behind the alleged constitutional deprivation"): *cf. Brown*, 520 U.S. at 405, 117 S.Ct. 1382 ("To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation.").

### 3. Inadequate Training and Supervision

In limited circumstances, a municipality's decision not to train or supervise employees regarding "their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); *see Sweat v. Butler*, 90 F.Supp.3d 773, 779–86 (W.D. Tenn. 2015) ("The legal standards for a claim of inadequate supervision and one of inadequate training are essentially the same."). A municipality's culpability "is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. To prevail on an inadequate training or supervision claim, a plaintiff must show that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference: and (3) the inadequacy was closely related to or actually caused the injury." *Regets v. City of Plymouth*, 568 Fed.Appx. 380, 394 (6th Cir. 2014).

" '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117 S.Ct. 1382. Thus, to establish deliberate indifference, a plaintiff ordinarily " 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.' " *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Stillwagon contends that the City has failed to train its officers on the determination of probable cause and on the role of self-defense in the probable cause analysis. (Pl.'s Opp'n to Mot. for Summ. J. at 50–51 [ECF No. 220].) Stillwagon also contends that the City inadequately supervised Segaard and Gerke. (*Id.* at 51–54.) Neither theory can survive summary judgment. Stillwagon has produced insufficient evidence of the City's deliberate indifference.

In support of his inadequate training theory, Stillwagon highlights Radabaugh's admissions that the detective bureau of the Delaware Police Department did not provide training on probable cause and that, to his recollection, the Delaware Police Department did not provide training on the role of self-defense in the probable cause analysis. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 50 51.) But these admissions, standing alone, cannot support a jury in reasonably concluding that the City acted with deliberate indifference. The City would have needed to disregard a known or obvious consequence of its alleged training inadequacies to have acted with deliberate indifference. *See Brown*, 520 U.S. at 410, 117 S.Ct. 1382. But Stillwagon points

to no prior instances of unconstitutional conduct that would allow a jury to reasonably conclude that the City was clearly on notice that its training on the determination of probable cause was deficient and likely to cause injury. *See Miller*, 606 F.3d at 255.

■ In support of his inadequate supervision theory, Stillwagon complains of Segaard and Gerke's broad discretion to handle their investigations as they saw fit. Radabaugh's discontinuance of weekly detective bureau meetings and annual employee evaluations, the ability of detectives to track their own work time, and Radabaugh's failure to review detectives' grand jury packets. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 52–53.) And as examples of prior misconduct, Stillwagon points to the department's failure to discipline Gerke when it discovered that he had been having an extra-marital affair with a woman who worked for a local agency; failure to investigate an allegation from Gerke's wife that Gerke had committed domestic violence against her; failure to have a system in place that could have discovered Gerke's thefts in office (for which, among other things, he was eventually fired); failure to discipline Segaard when, in 2011, he neglected to log evidence (a credit card) into the property room; and failure to discipline Segaard when, in 2013, he acted unprofessionally toward a victim of sexual assault. (*See id.* at 53; Radabaugh Dep. Vol. II at 166, 283–84, 289–90, 298–301 [ECF No. 196–1].)

Stillwagon's evidence, again, does not support a finding of deliberate indifference. Aside from Segaard's mishandling of evidence, none of Segaard and Gerke's misconduct is analogous to the misconduct alleged in this case. And, critically, none of the misconduct identified by Stillwagon—even Segaard's failure to log a credit card into the property room—was found, or even alleged to be, unconstitutional. *See*

*Miller*, 606 F.3d at 255 (stating that a plaintiff must ordinarily show prior instances of unconstitutional conduct). Consequently, this misconduct would not support a jury in reasonably concluding that the City was clearly on notice that its supervision of Segaard and Gerke was deficient and likely to cause injury. *See id.*

### 4. Unwritten Handcuffing Custom

■ A plaintiff can assert a municipal liability claim where a municipality's unconstitutional policy or custom caused the constitutional violation. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). This was the theory of liability advanced in *Monell*. There, the policy of the New York City Department of Social Services compelled pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons. *Monell*, 436 U.S. at 661, 98 S.Ct. 2018. The department's application of its leave policy was sufficient to establish municipal liability because the policy "in and of itself violated the constitutional rights of pregnant employees by reason of [the Supreme Court's] decision in *Cleveland Board of Education v. LaFleur*, [414 U.S. 632, 651, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974)]." *Tuttle*, 471 U.S. at 822, 105 S.Ct. 2427 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). When, by contrast, a policy is not itself unconstitutional, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Tuttle*, 471 U.S. at 824, 105 S.Ct. 2427 (footnotes omit-

ted); *see Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Where the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" (quoting *Brown*, 520 U.S. at 407, 117 S.Ct. 1382)).

Stillwagon has presented evidence, through the testimony of Pijanowski and several officers, that an unwritten custom at the Delaware Police Department mandated that all persons being detained or arrested be handcuffed behind the back. (*See* Pl.'s Third Mot. for Summ. J. at 6–10 [ECF No. 207].) The custom purportedly overruled the department's written policies and required, without exception for individual circumstances, cuffing behind the back. (*See id.*)

■ Stillwagon suggests that this custom is unconstitutional and, therefore, establishes municipal liability simply through its application in the present case. (*See* Pl.'s Third Mot. for Summ. J. at 11–12.) Stillwagon, however, has not identified any cases in which a court has found the policy of always handcuffing suspects behind the back to be inherently unconstitutional. He points instead to cases where an officer's decision to handcuff a plaintiff behind the back, coupled with the officer's other uses of force or the plaintiff's confinement in the back of a police cruiser, created a triable issue on whether the officer used excessive force. (*See* Pl.'s Second Mot. for Summ. J. at 24–28 [ECF No. 206] (citing *Dixon*, 291 Fed.Appx. at 762–63; *Turek*, 47 Fed.Appx. at 749–50; *Walton*, 995 F.2d at 1334, 1341–42).) That a plaintiff can sometimes survive summary judgment by alleging that she suffered, among other applications of force, handcuffing behind the back, does not mean that the municipal custom of handcuffing suspects behind the back is facially unconstitutional. Because Stillwagon was not injured by the applica-tion of an allegedly unconstitutional custom, Stillwagon cannot establish the City's liability by simply pointing to the application of the handcuffing custom in the present case.

■ To the extent that Stillwagon attempts to assert a custom of tolerance or acquiescence theory of municipal liability, Stillwagon's argument still fails. To prevail on that theory, a plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation. *Thomas*, 398 F.3d at 429. Stillwagon, however, has not produced evidence of any prior incidents involving an allegation that an officer handcuffed someone behind the back who, based on the circumstances, should have been cuffed in the front (i.e., an allegation that the custom caused an officer to use excessive force). (*See* Pl.'s Third Mot. for Summ. J. at 1–16.) And in the absence of any prior incidents of alleged unconstitutional behavior, no jury could reasonably conclude that a clear and persistent pattern of illegal activity existed, that the City was on notice of that activity, or that the City's tacit approval of the handcuffing custom amounts to deliberate indifference. *See Thomas*, 398 F.3d at 429.

For these reasons, the Court grants summary judgment to the Municipal Defendants on Stillwagon's municipal liability claim.

## H. State Law Claims

The Court next considers Stillwagon's state law claims (malicious prosecution,

civil conspiracy, and spoliation of evidence) against Segaard, Gerke, Willauer, and Radabaugh. In addition to seeking summary judgment on the merits of these claims, the Municipal Defendants also argue that each of the officers is entitled to immunity under Ohio Revised Code § 2744.03(A)(6).

### 1. Immunity under Ohio Revised Code § 2744.03(A)(6)

 Under O.R.C. § 2744.03(A)(6), an employee of a political subdivision is entitled to immunity in connection with the performance of governmental or proprietary functions unless, as relevant here, the employee's acts or omissions were "with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b). Employees enjoy a presumption of immunity under the statute. *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011).

 " 'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 658 N.E.2d 814, 821 (1995). " 'Bad faith' involves dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.* "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 33. And "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* ¶ 34.

 The information known to the officers, when viewed in the most favorable light, did not establish probable cause to arrest or prosecute Stillwagon. Further, Stillwagon has pointed to evidence from which a jury could conclude that Segaard omitted evidence and made false statements in his investigation report, that Segaard and Gerke falsified or fabricated evidence in the course of setting the prosecution in motion, and that Radabaugh approved of Segaard and Gerke's investigation. (*See* Pl.'s First Mot. for Summ. J. at 38–75 [ECF No. 205]; Pl.'s Opp'n to Mot. for Summ. J. at 43–44 [ECF No. 220].) With all of this information in mind, a jury could reasonably conclude that Segaard, Gerke, Willauer, and Radabaugh consciously disregarded or were indifferent to a known or obvious risk of harm to Stillwagon and, thus, acted recklessly in initiating and continuing Stillwagon's prosecution. *See Chavalia v. City of Cleveland*, 2017-Ohio-1048, 87 N.E.3d 705, ¶ 33, 2017 WL 1090991 (8th Dist.) ("[W]hether the employee acted in a wanton or reckless manner . . . is typically a question of fact for the jury."); *cf. Chesher v. Neyer*, 477 F.3d 784, 802 (6th Cir. 2007) (" '[T]he issue of wanton misconduct is normally a jury question.' " (quoting *Fabrey v. McDonald Vill. Police Dep't*, 70 Ohio St.3d 351, 639 N.E.2d 31, 35 (1994))). Section 2744.03(A)(6) does not entitle the Municipal Defendants to summary judgment on Stillwagon's state law claims.

### 2. Malicious Prosecution

 To prevail on a malicious prosecution claim under Ohio law, a plaintiff must establish "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732, 736 (1990). For purposes of a malicious prosecution claim,

"malice" is "an improper purpose, or any purpose other than the legitimate interest in bringing an offender to justice." *Anderson v. Eyman*, 5th Dist. Fairfield No. 07CA69, 180 Ohio App.3d 794, 2009-Ohio-102, ¶ 40, 907 N.E.2d 730. Malice may be inferred from the absence of probable cause. *Id.* And "[a] proceeding is 'terminated in favor of the accused' only when its final disposition indicates that the accused is innocent." *Ash v. Ash*, 72 Ohio St.3d 520, 651 N.E.2d 945, 947–48 (1995).

 Ohio courts have defined probable cause as " '[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.' " *Anderson*, 180 Ohio App.3d 794, 2009-Ohio-102, ¶ 41, 907 N.E.2d 730 (quoting *Dailey v. First Bank of Ohio*, 10th Dist. Franklin No. 04AP-1309, 2005-Ohio-3152, ¶ 15, 2005 WL 1483678). "Determining whether [a] criminal prosecution was undertaken in the absence of probable cause entails an inquiry into the facts and circumstances actually known to or reasonably within the contemplation of the defendants ... at the time of the instigation of the criminal proceedings." *Thompson v. R & R Serv. Sys., Inc. v. Cook*, Nos. 96APE10-1277, 96APE10-1278, 1997 WL 359325, at *8 (Ohio Ct. App. June 19, 1997). Thus, "[t]he relevant inquiry is not whether the arresting officer had probable cause to arrest [the plaintiff], but whether [the defendants] had probable cause to institute criminal proceedings against [the plaintiff]." *Id.*

 Under Ohio law, "[t]he return of an indictment by a grand jury raises a rebuttable presumption that probable cause exists." *Dailey,* 2005-Ohio-3152, ¶ 16. To rebut this presumption the plaintiff has the burden of producing "substantial evidence to establish lack of probable cause." *Anderson*, 180 Ohio App.3d 794, 2009-Ohio-102, ¶ 42, 907 N.E.2d 730. Ohio courts of appeal have interpreted this burden to mean that the plaintiff " 'must produce evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular.' " *Id.* (quoting *Deoma v. Shaker Heights*, 68 Ohio App.3d 72, 587 N.E.2d 425, 428 (1990)).

#### a. The Municipal Defendants' Motion for Summary Judgment

 The Municipal Defendants have argued, and the Court agrees, that a person cannot be held liable for malicious prosecution under Ohio law based on his testimony before the grand jury. *See Siegel v. O.M. Scott & Sons Co.*, 73 Ohio App. 347, 56 N.E.2d 345, 355 (1943) ("[B]y reason of public policy testimony given before a grand jury may not be the basis of a civil action for malicious prosecution."); *Taplin–Rice–Clerkin Co. v. Hower*, 124 Ohio St. 123, 177 N.E. 203, 204 (1931) (holding that "testimony given before the grand jury is privileged, and. in a case for malicious prosecution, ... is therefore inadmissible"). But this conclusion does not defeat Stillwagon's Ohio law malicious prosecution claim. In its analysis of Stillwagon's § 1983 malicious prosecution claim, the Court reviewed the substantial evidence that Stillwagon produced to rebut the presumption of probable cause created by the grand jury indictment. And some of this evidence (the purported falsehoods in Segaard's Investigation Report, in particular) suggests that the return of the indictment resulted from perjured testimony. Because a jury could reasonably find in Stillwagon's favor on his Ohio law malicious prosecution claim, the Municipal Defendants' request for summary judgment on the claim is denied.

### b. Stillwagon's Motion for Summary' Judgment

Stillwagon has moved for summary judgment against Segaard and Willauer on his Ohio law malicious prosecution claim. (*See* Pl.'s First Mot. for Summ. J. at 1 [ECF No. 205].) As explained though in the Court's discussion of the § 1983 malicious prosecution claim, a jury could reasonably conclude that Segaard and Willauer had probable cause to prosecute Stillwagon. Stillwagon's request for summary judgment on his Ohio law malicious prosecution claim is therefore denied.

### 3. Civil Conspiracy

The elements of an Ohio law civil conspiracy claim are "(1) a malicious combination; (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself." *Cantleberry v. Holbrook*, 5th Dist. No. 12CA75, 2013-Ohio-2675, ¶ 22, 2013 WL 3280023. "A civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App. 3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 40 (10th Dist.). "The 'malice' in 'malicious combination' is legal or implied malice, 'which the law infers from or imputes to certain acts,' and is defined as 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another,'" *Gosden v. Louis*, 116 Ohio App.3d 195, 687 N.E.2d 481, 496 (1996) (quoting *Pickle v. Swinehart*, 170 Ohio St. 441, 166 N.E.2d 227, 229 (1960)), As such, malice is "inferred from or imputed to a common design by two or more persons to cause harm to another by means of an underlying tort, and need not be proven separately or expressly." *Id.*

For the same reasons that a jury could reasonably find in favor of Stillwagon on his § 1983 civil conspiracy claim, a jury could also reasonably find in Stillwagon's favor on his Ohio law civil conspiracy claim. Accordingly, the Municipal Defendants' request for summary judgment on this claim is denied.

### 4. Spoliation of Evidence

Stillwagon accuses the officers of destroying several pieces of evidence: (i) evidence of blood and other DNA-containing substances on the rear area of Stillwagon's pistol; (ii) the recording of Segaard's phone conversation with Lois Reninger (a witness to the events on Route 42); and (iii) maps, diagrams, and drawings created by Stillwagon, Mattingly, and Chris Linkous (a witness to the events in the Auto-Zone parking lot) during their interviews with the police. (Pl.'s Opp'n to Mot. for Summ. J. at 55–56 [ECF No. 220].)

To prevail on a spoliation claim, a plaintiff must show "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 615 N.E.2d 1037, 1038 (1993). In a spoliation case, the term "willful" reflects " 'an intentional and wrongful commission of the act.' " *Heimberger v. Zeal Hotel Grp., Ltd.*, 2015-Ohio-3845, 42 N.E.3d 323, ¶ 37 (10th Dist.) (quoting *White v. Ford Motor Co.*, 142 Ohio App.3d 384, 755 N.E.2d 954, 957 (2001)).

### a. Reddish Substance on the Pistol

The Municipal Defendants first challenge the assertion that the officers

spoliated evidence on the rear area of Still-wagon's pistol. Because Stillwagon has purportedly failed to present evidence indicating that Mattingly's DNA was actually on the pistol, the Municipal Defendants argue that Stillwagon cannot show that the officers destroyed evidence. (Defs.' Reply in Supp. of Mot. for Summ. J. at 32 [ECF No. 233].) This argument fails, as it views Stillwagon's spoliation claim too narrowly. Stillwagon does not argue simply that the officers destroyed DNA; he argues that "evidence of blood, and other DNA-containing substances," was removed from the rear of the pistol. (Pl.'s Opp'n to Mot. for Summ. J. at 55 [ECF No. 220].) The reddish substance visible on the pistol in a photograph taken on the day of the incident is the evidence that was purportedly spoliated. (*See id.* at 55, 62–63.) And by the time of trial, the substance was no longer on the pistol. (*Id.* at 64.)

The Municipal Defendants also argue that Stillwagon has failed to show that the officers willfully destroyed the evidence on the pistol. (Defs.' Reply in Supp. of Mot. for Summ. J. at 32–34.) The pistol was checked out of evidence on three occasions before trial: (1) on July 29, 2013, to Evidence Technician Heidi Thomas; (2) on September 28, 2013, to Radabaugh for test firing; and (3) on September 30, 2013, to Segaard to be used as evidence at trial. (Pl.'s Opp'n to Mot. for Summ. J. at 63.) When viewed in the light most favorable to Stillwagon. this evidence regarding the pistol's custody prior to trial, coupled with the evidence indicating that Segaard omitted and falsified information in his Investigation Report and that Radabaugh approved of that Report, creates a genuine issue of material fact on whether Segaard or Radabaugh willfully removed the reddish substance to disrupt Stillwagon's case. This evidence does not suggest, however, that Gerke or Willauer willfully removed the reddish substance; consequently, they

are entitled to summary judgment on this portion of the spoliation claim.

### b. Segaard's Phone Conversation with Lois Reninger

▇ The Municipal Defendants next contend that there is no evidence that a recording of a phone conversation between Segaard and Lois Reninger was ever made and that, therefore, Stillwagon cannot show that the recording was willfully destroyed. (Defs.' Reply in Supp. of Mot. for Summ. J. at 34 [ECF No. 233].) The Court agrees.

Segaard has testified that he spoke with Reninger by phone on October 1, 2012, the day after the incident. (Segaard Dep. Vol. IV at 799–800 [ECF No. 199–1].) Calls to Segaard's desk phone at the police station were recorded. (*Id.* at 801.) However, there is no recording of Segaard's conversation with Reninger. (*See id.* at 800–01.) When asked what happened to the recording of the call, Segaard responded: "I don't know that I specifically made one." (*Id.* at 800.) Segaard speculated that Reninger's call might have been forwarded from his desk phone to his cell phone. (*Id.* at 801–02.) And because Segaard's cell phone does not have the same recording capabilities as his desk phone, the call would not have been recorded. (*Id.* at 802.) Stillwagon argues that Reninger may have called Segaard's desk phone at the police station and that if she did—and if the call was automatically recorded—then Segaard may have willfully destroyed the recording. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 64 [ECF No. 220].) This line of reasoning is overly speculative and cannot sustain a spoliation claim. *See Wheatley v. Marietta Coll.*, 2016-Ohio-949, 48 N.E.3d 587, ¶ 105 (4th Dist.) ("[T]o sustain a spoliation claim, the plaintiff must offer proof that the defendant destroyed evidence that actually existed. A spoliation claim cannot be based upon conjecture that evidence might

have existed and that a party might have destroyed it."). Consequently, the officers are entitled to summary judgment on this portion of Stillwagon's spoliation claim.

### c. Maps, Diagrams, and Drawings

 Lastly, the Municipal Defendants contend that there is no evidence that the maps, diagrams, and drawings (the "drawings") created during the police interviews with Stillwagon, Mattingly, and Linkous were willfully destroyed or that the drawings' destruction disrupted Stillwagon's case. (Defs.' Reply in Supp. of Mot. for Summ. J. at 35–37 [ECF No. 233].)

In an email to one of the Delaware County prosecutors, Segaard acknowledged that he "didn't keep any of [the notes and drawings]" made during the interviews with Stillwagon and Mattingly. (May 29, 2013 Segaard Email at PageID 8734 [ECF No. 220–3].) Segaard later testified that he does not know what happened to those drawings or what happened to the drawings created during his meeting with Linkous. (*See* Segaard Dep. Vol. I at 206 [ECF No. 160–1]; Segaard Dep. Vol. II at 437–38, 517–20 [ECF No. 162–1].) This evidence that Segaard destroyed or misplaced the drawings, together with the other evidence in this case indicating that Segaard omitted and falsified information in his Investigation Report, creates an issue for the jury on whether Segaard willfully destroyed the drawings to disrupt Stillwagon's case.

Although Gerke was present during Stillwagon's interview and Mattingly's second interview, the evidence produced by Stillwagon does not suggest that Gerke had a role in the destruction or misplacement of the drawings. Nor does the evidence suggest that Willauer or Radabaugh had a role in destroying or misplacing the documents. As such, Gerke, Willauer, and Radabaugh are entitled to summary judgment on this portion of the spoliation claim.

Stillwagon avers that the destruction of the drawings disrupted his criminal case because the lost information would have helped to prove his innocence. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 55–56 [ECF No. 220].) And, according to Stillwagon, the destruction has also disrupted this case because the same lost information would have further demonstrated that no probable cause existed to prosecute him. (*See id.*) The drawings illustrated statements about the incident made by Stillwagon, Mattingly, and Linkous. Stillwagon's drawings could have bolstered his assertion that he acted in self-defense and was not attempting to shoot Mattingly. And the drawings from the interviews with Mattingly and Linkous could have highlighted the inaccuracies in the statements made by those two individuals. Consequently, a genuine issue of material fact exists on whether the destruction of the drawings disrupted Stillwagon's criminal case, civil case, or both.

In sum, Stillwagon can present to the jury the portions of his spoliation claim dealing with the reddish substance on the pistol (against Segaard and Radabaugh) and the drawings (against Segaard). The officers are entitled to summary judgment on all other portions of the spoliation claim.

## V. CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Municipal Defendants' Motion for Summary Judgment [ECF No. 203; '1606 ECF No. 189] and Motion to Strike [ECF No. 231; '1606 ECF No. 217], **DENIES** Stillwagon's motions for summary judgment [ECF Nos. 205. 206, 207; '1606 ECF Nos. 191, 192, 193], and **GRANTS** the Municipal Defendants' Motion to Exclude [ECF No. 232; '1606 ECF No. 218].

The Municipal Defendants are entitled to summary judgment on the supervisory liability claim against Willauer, the failure to protect claim against Ailes and Flynn, the municipal liability claim against the City, and portions of the spoliation of evidence claim.

**IT IS SO ORDERED.**